COMMUNITY–SERVICE BROADCAST-
ING OF MID–AMERICA, INC., et
al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

No. 76–1081.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Jan. 6, 1978.

Decided Aug. 25, 1978.

As Amended Sept. 29, 1978.

Richard D. Marks, Washington, D. C., with whom Daniel W. Toohey, Washington, D. C., was on brief, for petitioners. Patrick M. Connolly, Washington, D. C., also entered an appearance for petitioners.

C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel for the F. C. C., Washington, D. C., at the time the briefs were filed, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., and Lee I. Weintraub, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondents. Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondents.

Marc I. Steinberg and H. Stephen Holloway, Washington, D. C., United States Senator Robert Griffin urging constitutionality.

Theodore D. Frank, Washington, D. C., filed a brief on behalf of amicus curiae Public Broadcasting Service urging unconstitutionality.

James L. McHugh, Jr., Washington, D. C., filed a brief on behalf of amicus curiae Corp. for Public Broadcasting urging unconstitutionality.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Chief Judge, J. SKELLY WRIGHT, filed the opinion of the court (Parts I and IV), in which Circuit Judges, BAZELON, McGOWAN, ROBINSON, and WILKEY, joined. Circuit Judge, WILKEY, also joined in Parts II, III and V. Circuit Judges BAZELON and SPOTTSWOOD W. ROBINSON, III, filed opinions concurring in part.

Circuit Judge, LEVENTHAL, joined by Circuit Judge, TAMM, filed a dissenting opinion.

Circuit Judge, MacKINNON, joined by Circuit Judge, ROBB, filed a dissenting opinion.

On Rehearing *En Banc*

J. SKELLY WRIGHT, Chief Judge:

This case involves Section 399(b) of the Communications Act, 47 U.S.C. § 399(b) (Supp. V 1975), and the rules promulgated thereunder by the Federal Communications Commission, *Report and Order*, Docket 19861, 57 FCC2d 19 (December 19, 1975). These provisions require all noncommercial educational radio and television stations [1] which receive any federal funding under the authority of the Communications Act to make audio recordings of all broadcasts "in which any issue of public importance is discussed." [2] The licensee must retain the audio recording for 60 days, and must pro-

---

1. Noncommercial educational radio and television stations include both those functioning solely or primarily to provide classroom instructional programs and those directed at more general audiences. The term "public broadcasting" came into use following the passage of the Public Broadcasting Act of 1967; while public broadcasting technically does not include instructional programming, educational broadcasting and public broadcasting are generally used interchangeably. The requirements which an organization must meet to apply for a noncommercial educational license, and the regulations governing conduct of such licensees, are set forth at 47 C.F.R. § 73.621 (1976).

2. Initially the Commission equated "any issue of public importance" with the fairness doctrine's "controversial issue of public importance." Notice of Proposed Rulemaking, 38 Fed.Reg. 31456 (1973). Prompted in part by correspondence from Senator Robert Griffin which strongly took issue with this position, the Commission significantly broadened its definition of the programming subject to § 399(b)'s recording requirement. Specifically, the Commission called for recording and retention of those programs "which consist of talks, commentaries, discussions, speeches, editorials, political programs, documentaries, forums, panels, roundtables, and similar programs primarily concerning local, national, and international public affairs." *Report and Order*, Docket 19861, 57 FCC2d 19, 21 & n.11 (1975).

vide a copy to any member of the Federal Communications Commission who requests one, or to any member of the public within seven days of receiving a request and payment of reasonable costs.[3]

■ Petitioners here, a number of noncommercial educational broadcast stations, challenge the constitutionality of these requirements, arguing that Section 399(b) and the rules promulgated by the FCC to en-

force it violate the First and Fifth Amendments of the Constitution. We agree. We hold that Section 399(b) of the Communications Act places substantial burdens on noncommercial educational broadcasters and presents the risk of direct governmental interference in program content. Since no substantial governmental interest has been shown on the other side of the constitutional balance, the statute and rules at issue are unconstitutional.[4]

3. Where a program is supplied by a network or other entity, the licensee may designate that entity to record and retain the broadcast. Such entities are permitted 21 days to provide copies upon request. *Id.* at 23–24.

4. Section 399(b) on its face requires that "*each licensee* which receives *assistance under sections 390 to 399* of this title after August 6, 1973, shall retain an audio recording of *each of its broadcasts of any program* in which *any issue of public importance is discussed.*" (Emphasis added.) Judge Leventhal seeks to rewrite this statute to avoid the constitutional infirmities that mandate its invalidation. Judge Leventhal does not disagree that the First Amendment is brought "into play" by this statute; he recognizes that compliance with § 399(b)'s recording requirement may "discourage the communication of ideas or information," and that the statute can therefore be upheld as constitutional only if it is narrowly tailored to serve a "substantial" government interest. Leventhal dissent, 192 U.S.App.D.C. at ——, 593 F.2d at 1144. And Judge Leventhal admits that he is unable to discern any substantial government interest which would be narrowly served by application of the statute according to its plan meaning. *Id.*, 192 U.S.App.D.C., at ——, 593 F.2d at 1146. But Judge Leventhal seeks to avoid the conclusion that follows from this—that the statute is indeed unconstitutional—by arguing that the legislative purpose of § 399(b) was to provide a means for congressional oversight of compliance with § 396(g)(1)(A)'s requirement of "strict objectivity and balance," a statutory requirement (1) which by its terms is applicable only to the Corporation for Public Broadcasting, as distinguished from "each licensee"; (2) which applies only to programs actually funded by CPB, as distinguished from "assistance under sections 390 to 399" (such assistance includes funding for operations, salaries, and equipment, as well as programming); and (3) which is applicable only to "programs of a controversial nature," as distinguished from "any program in which any issue of public importance is discussed." On this basis Judge Leventhal wholly rewrites § 399(b) so that individual licensees receiving assistance under §§ 390–399 would be required to record only

those programs which are directly funded by CPB under § 396 and which are "of a controversial nature"; § 399(b), in sharp contrast, according to its plain words requires all such licensees to record all of their programming in which any "issue of public importance is discussed," whether or not the program is funded by the federal government and whether or not it is controversial.

There are, we think, a number of serious flaws with this approach, and with the result it reaches. First of all, as Judge Leventhal himself recognizes, the case law provides no support for the kind of wholesale judicial redrafting of clearly stated legislation in which he engages here. To be sure, it is well established that where the meaning of a statute is not clear, and where constitutional questions are raised by a plausible interpretation, the courts should seek to construe the statute to avoid the constitutional questions. *See, e. g., Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). But where the language of a statute is clear and its meaning plain, the Supreme Court has repeatedly cautioned against judicial efforts to rewrite the statute on the basis of the policies or objectives said to be served by the legislation. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197–201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961). *See also Lubrizol Corp. v. EPA*, 183 U.S.App.D.C. 288, 299 & n.25, 562 F.2d 807, 818 & n. 25 (1977). In this case there is no uncertainty as to the meaning of the statute. Section 399(b) clearly and unambiguously imposes a recording requirement on all noncommercial licensees receiving assistance under §§ 390–399; and it clearly imposes this requirement for all programs in which issues of "public importance" are discussed. Application of the requirement does not turn upon whether or not the particular program to be recorded is supported by federal funds, nor does it turn upon whether the programming is controversial or not. Judge Leventhal's construction, which limits the requirement only to controversial programming and only to programming supported by CPB under § 396, is entirely inconsistent with the unambiguous plain words and meaning of the statute.

## I

The significance and function of Section 399(b) cannot be understood apart from the larger scheme of federal involvement in noncommercial broadcasting. It is to this system that we turn first, in order to place the requirement under review here in its proper context.

Public broadcasting dates back at least to 1919 when Radio Station 9XM began broad-casting from the University of Wisconsin.[5] In 1939 the FCC first reserved certain space on the radio spectrum for educational radio,[6] and in 1952 frequencies were reserved for public television as well.[7] It was not until 1962, however, that the federal government became involved in a direct funding program for public broadcasting, and even that program was limited to construction of station facilities.

Even if examination of the legislative history were necessary in this case to determine the meaning of the statute, Judge Leventhal's construction is hardly one which is supported, let alone compelled, by the available legislative history. To begin with, Judge Leventhal relies on the oral statements of a single senator, Senator Griffin, to support his revision of the statute. Such statements, however, are recognized as perhaps the weakest basis for construing the intent of Congress inconsistently with the plain meaning of a statute. *See* H. Hart & A. Sacks, The Legal Process (tent. ed. 1958). Second, and more important, assuming Senator Griffin's purpose as determinative, the fact is that he affirmatively *did not* intend the recording requirement to apply only to those programs subject to § 396(g)(1)(A)'s requirement of strict objectivity and balance, as Judge Leventhal argues. The requirement of strict objectivity and balance applies only to programs "of a controversial nature" supported by CPB; by contrast, § 399(b) mandates recording by licensees subject to its requirement of all programs "in which any issue of public importance is discussed."

In its initial Notice of Proposed Rulemaking to implement § 399(b), the Commission proposed that § 399(b)'s coverage be limited to programs dealing with any *"controversial* issue of public importance." Senator Griffin took issue with this definition in a letter to the Commission, arguing that the coverage of § 399(b) should be defined more broadly than the Commission had proposed and should include any program in which any issue of public importance was discussed. Prompted by Senator Griffin's views as to the intent of Congress and by the inclusion of the words "*any* issue of public importance" in the statute, the Commission reconsidered its position and adopted a broad rule of coverage for § 399(b). *See* note 2 *supra.* Thus it is clear that Senator Griffin's objectives, upon which Judge Leventhal relies so heavily, were not limited to imposing a recording requirement only on those programs subject to the objectivity and balance standard; in his view, the coverage of § 399(b) was intended to be far broader. Indeed, had Senator Griffin, or anyone else in Congress, intended to impose the recording requirement only upon controversial programming funded by CPB, one is hard pressed to imagine why they would have enacted a statute so clearly and unambiguously applicable to all of the public affairs programming of all licensees receiving federal assistance under any of the provisions of §§ 390–399. The congressional purpose advanced by Judge Leventhal is, quite simply, inconsistent with the plain words and meaning of the statute which Congress in fact enacted.

Finally, Judge Leventhal's approach, in seeking to avoid the clear constitutional problems stemming from the application of the statute according to its plain meaning, creates new and potentially equally troubling constitutional questions which would not otherwise be raised. As passed by Congress, the statutory requirement of strict objectivity and balance serves as a standard for CPB to follow in its funding decisions. Judge Leventhal's version of the statute, however, enforces this strict standard against the individual licensees themselves. Such a construction not only appears inconsistent with Congress' repeatedly stated desire to leave the individual licensees as free as possible from government regulation of programming; it also raises difficult and far-ranging questions as to the permissible scope of government content regulation of licensees, particularly in light of the Supreme Court's cautious approval of the more limited fairness doctrine in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Under Judge Leventhal's approach, we in the judiciary would be forced to impose, and to adjudicate the constitutionality of, a direct content restraint on licensees which Congress itself has not in fact chosen to impose. Rather than solving all of the constitutional problems of § 399(b), then, Judge Leventhal's approach succeeds only in substituting new problems for those that beset the statute as it was written and intended.

5. S. Frost, Education's Own Stations 464 (1937). *See generally* Note, *"Balance and Objectivity" in Public Broadcasting: Fairer Than Fair?*, 61 Va.L.Rev. 643, 644–648 (1975).

6. 47 C.F.R. §§ 4.131–133 (1939).

7. 17 Fed.Reg. 4054–4059 (1952).

The Educational Television Broadcasting Facilities Act,[8] passed in 1962, authorized a total of 32 million dollars to be spent on public television over a five-year period.[9] Under the Act the Secretary of Health, Education, and Welfare distributes funds for acquisition of physical equipment necessary for television transmission, subject to a local matching requirement and a per-state limitation on funding. Money received under these provisions may be used only for equipment, not for salaries, operating expenses, or program production.

Five years later the Carnegie Commission on Educational Television completed its landmark study of public broadcasting. Its report, Public Television: A Program for Action, found that noncommercial television stations were in need of far greater financial support—above and beyond the existing reservation of frequencies by the FCC and the facilities grant program administered by HEW—if they were to realize their full potential. While the Carnegie Commission recognized an important role for state and local governments and private sources in funding public television stations, it concluded that federal support of operations and programming was essential to raising the significantly larger sums of money necessary for an effective system of public television. Carnegie Commission on Educational Television, Public Television: A Program for Action 33–35 (1967). The Commission then focused on the means for providing this federal funding:

> Because we contemplate federal assistance to Public Television on a far larger scale than at present, the pressing need arises to identify the manner in which federal funds will flow to the system. There is at once involved the relation between freedom of expression, intimately and necessarily a concern of Public Television, and federal support.

Recognizing areas of special sensitivity, the Commission is persuaded that a nongovernmental institution is necessary to receive and disburse at least a part of those funds. *The purpose is not to escape scrutiny but to minimize the likelihood that such scrutiny will be directed toward the day-to-day operations of the sensitive program portions of the Public Television system.* * * *

*Id.* at 36–37 (emphasis added).

The Carnegie Commission's recommendation that federal financial support of programming and operations be provided through a Corporation for Public Broadcasting (CPB) was adopted by Congress in the Public Broadcasting Act of 1967. In its declaration of policy contained in this Act Congress found "that a private corporation should be created to facilitate the development of educational radio and television broadcasting and to afford maximum protection to such broadcasting from extraneous interference and control." 47 U.S.C. § 396(a)(6) (1970). CPB, a nonprofit District of Columbia corporation, was established to serve this purpose. *Id.* § 396(b). Under the Act CPB is governed by a 15-member Board of Directors, appointed by the President subject to confirmation by the Senate, no more than eight of whom may be members of the same political party. *Id.* § 396(c)(1). The Board is authorized to disburse funds it receives to program production entities and noncommercial broadcast stations,[10] to arrange for an interconnection system capable of distributing programs to noncommercial stations, to conduct research and demonstrations, and to encourage creation of new noncommercial stations. *Id.* § 396(g)(2). While granting CPB "the usual powers" of a nonprofit corporation under District of Columbia law, *id.*

---

8. Act of May 1, 1962, Pub.L.No.87–447, 76 Stat. 64, *codified at* 47 U.S.C. §§ 390–395 (1970).

9. The most recent amendment to the Act authorizes appropriations of 30 million dollars for fiscal year 1977 to assist in construction of television or radio facilities through matching grants. 47 U.S.C.A. § 391 (1977 pocket part).

10. Under the Act stations receiving funds from CPB must meet the licensing requirements of the FCC applicable to noncommercial stations and must be owned and operated by a public agency or nonprofit private foundation, corporation, or association. 47 U.S.C. § 397(7) (1970).

**1108**

§ 396(g)(3), Congress expressly prohibited the Corporation from owning or operating any station, network, or interconnection facility, or from contributing to or otherwise supporting any candidate for office. *Id.* § 396(f), (g)(3). In assisting in programming development CPB is required to adhere strictly to a standard of "objectivity and balance in all programs * * * of a controversial nature." *Id.* § 396(g)(1)(A). And in their local programming no noncommercial station may "engage in editorializing or may support or oppose any candidate for political office." 47 U.S.C. § 399(a) (Supp. V 1975).[11]

Establishment of the CPB and the statutory scheme of the Public Broadcasting Act were a product of a congressional determination that strong safeguards were necessary to ensure that federal funding of programming did not carry with it any political influence on the contents of that programming. Thus the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance should in no way involve the Government in programming or program judgments. An independent entity supported by Federal funds is required to provide programs free of political pressures. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.
>
> \* \* \* \* \* \*
>
> Your committee has heard considerable discussion about the fear of Government control or interference in programming if S. 1160 is enacted. We wish to state in the strongest terms possible that it is our intention that local stations be absolutely free to determine for themselves what they should or should not broadcast. As

President Johnson said in his message of February 28:

> Noncommercial television and radio in America, even though supported by Federal funds, must be absolutely free from any Federal Government interference over programming.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967). The same theme is echoed in the House Report:

> How can the Federal Government provide a source of funds to pay part of the cost of educational broadcasting and not control the final product? That question is answered in the bill by the creation of a nonprofit educational broadcasting corporation.
>
> Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds. \* \* \*

H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967).

This is not to say, of course, that Congress chose to place public broadcasting beyond any form of federal regulation. Individual stations are licensed by the FCC and are generally subject to the same regulations as are commercial licensees.[12] While the Public Broadcasting Act provides that nothing in the 1962 or 1967 Acts "shall be deemed \* \* \* to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over the Corporation or any of its grantees or contractors \* \* \*," 47 U.S.C. § 398 (1970), the

---

11. The constitutionality of the editorializing prohibition of § 399(a), 47 U.S.C. § 399(a) (Supp. V 1975), is not at issue in this case.

12. Exceptions include 47 C.F.R. § 73.621 (1976) (qualification standards for noncommercial

broadcasters and regulations governing advertising) and 47 U.S.C. § 399(a) (Supp. V 1975) (prohibition on editorializing by noncommercial stations), as well as § 399(b).

CPB is accountable to Congress and the public. It is required to prepare an annual report of its activities for transmittal to Congress, must be audited annually, is subject to audit by the General Accounting Office, and, finally, is subject to congressional oversight through the appropriations process. 47 U.S.C. § 396(i) (Supp. V 1975), 47 U.S.C. § 396(*l*) (1970).

But even in this oversight process the statutory scheme is designed to foreclose Congress from exercising any control over programming; while it can examine CPB's overall performance, congressional oversight does not extend to directing CPB—or the Public Broadcasting Service (PBS), the interconnections facility formed by stations and funded largely by CPB to transmit programming to local licensees [13]—as to which programs or entities are deserving of support. Moreover, the federal government is not the sole source of funds for CPB, nor is it the primary source of financial support for public broadcasting as a whole [14]; in fiscal year 1976 only 27.7 percent of total public broadcasting income was provided by federal sources.[15] Finally, neither CPB nor PBS can themselves determine which programs are actually seen by viewers around the country; the ultimate decision as to whether an available program is broadcast is left to the local stations, which CPB is foreclosed from owning or operating under the statute. The only constraint on the local stations' discretion in this respect imposed by statute is that they refrain from editorializing or endorsing any political candidate.

Thus we have in effect a carefully balanced system of dual checks against political influence over programming: the Corporation is free, within the constraints of objectivity and balance, of congressional interference in determining which entities or endeavors to support, and the stations are free, subject to generally applicable FCC regulation, to accept or reject programs supported by CPB and transmitted by PBS or National Public Radio. As the House Report stated:

> In the same manner that the bill strives to insulate the Corporation from governmental control, the bill provides and the committee intends to see to it that the local educational broadcasting stations conduct their operations without Corporation interference or control.

H.R.Rep.No.572, *supra*, at 20.

This court has been sensitive to maintain the delicate balance struck by Congress in the Public Broadcasting Act in our decisions construing that Act. Thus in *Accuracy in Media, Inc. v. FCC*, 172 U.S.App.D.C. 188, 521 F.2d 288 (1975), we upheld the FCC's determination that it lacked jurisdiction to enforce the "objectivity and balance" standard of the Act against the CPB, emphasizing that an opposite result might enlarge governmental control of programming and thereby raise substantial constitutional questions. And in *Network Project v. Corp. for Public Broadcasting*, 183 U.S.App.D.C. 70, 561 F.2d 963 (1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978), we held that private rights of action

---

**13.** The Public Broadcasting Act and CPB authorize funds for both noncommercial radio and television. The interconnection service for radio is performed by National Public Radio.

**14.** The Carnegie Commission Report emphasized that CPB should be permitted to solicit resources from private sources, and this recommendation was adopted by Congress. 47 U.S.C. § 396(g)(2)(A) (1970). According to the Carnegie Commission, CPB's "freedom from political control will be all the greater if it possesses resources for which it is not dependent upon the government, even though those resources constitute only a part of its total needs." Carnegie Commission on Educational

Television, Public Television: A Program for Action 41 (1967). Appropriations to CPB in any year are limited by statute to 40% of the total amount received by public broadcasting from nonfederal sources two years before. 47 U.S.C. § 396(k)(3) (Supp. V 1975).

**15.** In fiscal year 1976 public broadcasting income totaled $413,075,000, of which $114,030,000 was provided by federal sources. Group on Analysis and Projection of the Task Force on Long Range Financing, Public Broadcasting Finances: Profile and Projection (Preliminary Draft, May 31, 1977); brief for *amicus curiae* Public Broadcasting Service at 7 n.6.

could not be implied from the Act to control CPB's activities. Any oversight of the Corporation, we found, could take place only through requirements of audits and accountability, as well as appropriations.

## II

Section 399(b) was passed as an amendment to the Communications Act in 1973 with little debate or other legislative history. Two years later the FCC, in accordance with its statutory mandate, promulgated regulations governing compliance with the recording requirement. The petitioners sought review, arguing that the statute and regulations are unconstitutional in that they provide a "ready mechanism" not previously available for members of Congress and other government officials to involve themselves in disputes over the contents of individual programs and to influence programming decisions in the future. Brief for petitioners at 42–43. They contend that as a result Section 399(b)—in its purpose and operation—serves to burden and chill the exercise of First Amendment rights by noncommercial broadcasters.

■■■ Before addressing ourselves to the substance of petitioners' First Amendment claims, we must take note of two preliminary propositions about which there is no·

dispute. The first is that noncommercial licensees are fully protected by the First Amendment. Clearly, the existence of public support does not render the licensees vulnerable to interference by the federal government without regard to or restraint by the First Amendment. For while the Government is not required to provide federal funds to broadcasters, it cannot condition receipt of those funds on acceptance of conditions which could not otherwise be constitutionally imposed. *See Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Thus the Government cannot control the content or selection of programs to be broadcast over noncommercial television any more than it can control programs broadcast over commercial television [16]; in making such decisions—which are at issue in this case—noncommercial broadcasters, no less than their commercial counterparts, are entitled to invoke the protection of the First Amendment and to place upon the Government the burden of justifying any practice which restricts free decisionmaking.[17] The second undisputed proposition requires even less discussion, though it is no less important: that the public affairs programming which is the subject of Section 399(b)'s recording requirement lies at the core of the First Amendment's protec-

16. *Cf. National Broadcasting Co. v. United States*, 319 U.S. 190, 204–206, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (radio licensees required to exercise discretion independent of national networks); *Writers Guild of America, West v. FCC*, 423 F.Supp. 1064 (C.D.Calif. 1976) (First Amendment violated where FCC, national networks, and professional associations jointly pressured local stations to set aside a "family hour" for programming suitable for viewing by children).

17. This is not to say that government may never participate in the marketplace of ideas or contribute its own views to those of other speakers. Where Congress chooses to finance a program adhering to certain standards or expressing certain points of view and makes it available to licensees, who are subject to no requirement that they broadcast it, then arguably no First Amendment rights are implicated. But grave constitutional questions are clearly

raised where government, either directly or indirectly, compels an individual or a station to adhere to or express views of the government's choosing. *See Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (statute requiring motor vehicle license plates to be embossed with state motto, "Live Free or Die," held unconstitutional); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (compulsory flag salute by schoolchildren held unconstitutional). Nor can government, by its participation in the marketplace, "drown out" private communication. *See* L. Tribe, American Constitutional Law 588–590 (1978). Where government licensing and regulation is premised on the scarcity of a medium of communication, then even noncoercive and seemingly voluntary contracts or grants by which government uses that medium to express or enforce a point of view must be strictly scrutinized.

tions.[18]  While scholars have differed on how broadly to define any core protection of the First Amendment, all have agreed that vigorous open discussion of public issues should be included.[19]

The First Amendment requires that the strictest form of scrutiny be applied where the purpose of a statute is related to suppression of free expression of ideas or information.  Applying such strict scrutiny, the Supreme Court has held that the statute or regulation *must* be found unconstitutional unless either the speech in question is not fully protected by the First Amendment or its suppression is essential to a compelling governmental interest,[20] as where the message being suppressed poses a clear and present danger to the national well-being.[21]  In this case, as noted earlier, it is undisputed that the speech subject to regulation by Section 399(b)—public affairs programming by noncommercial licensees—is entitled to the full panoply of First Amendment protection.  Nor is there any argument that Section 399(b) serves a compelling government interest;  the FCC has conceded that there is no compelling governmental objective which can be invoked in support of the statute.[22]  As a result, if this statute is viewed as one relating to suppression of free expression, it must be held unconstitutional.  And it could, we think, be so viewed.

First of all, the statute on its face is *not* content neutral.  Application of the statutory recording requirement is dependent upon the subject matter of programming;  only programming concerning issues

**18.**  *See Buckley v. Valeo*, 424 U.S. 1, 14–15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976);  *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971) ("it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office").

**19.**  *See, e. g.*, T. Emerson, The System of Free Expression (1970);  A. Meiklejohn, Free Speech and Its Relation to Self-Government (1948);  Kalven, *The New York Times Case: A Note on "The Central Meaning of the First Amendment"*, 1964 S.Ct.Rev. 191.  *See generally* L. Tribe, *supra* note 17, at 578–579.

**20.**  *See, e. g., Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972);  *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971);  *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).  *See also* L. Tribe, *supra*, note 17, at 591 ("If the first amendment requires an extraordinary justification of government action which is aimed at ideas or information that government does not like, the constitutional guarantee should not be avoidable by government action which seeks to attain that unconstitutional objective under some other guise.");  *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968);  *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960);  *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

**21.**  *See, e. g., Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931) ("No one would question but that [when a nation is at war] a government might prevent actual obstruction to its recruiting service or

the publication of the sailing dates of transports or the number and location cf troops.").  *See also New York Times Co. v. United States*, 403 U.S. 713, 726 (Brennan, J., concurring), 730 (Stewart, J., concurring), 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

While the scarcity of the broadcast spectrum may justify enhanced government regulation over access to that spectrum, this rationale has been construed narrowly, *compare Red Lion Broadcasting Co. v. FCC, supra* note 4, *with Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).  Certainly spectrum scarcity cannot be invoked to support a government attempt to penalize or suppress speech, based on its general content, by some, but not all, broadcast licensees;  scarcity hardly serves as a convincing justification where only some licensees are subject to regulation.

**22.**  The record in this case was initially remanded by a panel of this court to the Commission to secure its responses to certain questions raised by petitioners' First Amendment challenge.  In response to the question whether the governmental interest advanced by § 399(b) is unrelated to suppression of free expression, the Commission admitted that "it is difficult to identify a compelling governmental interest in the requirements of Section 399(b)," and offered no suggestions as to any purposes which might be so considered.  Instead the Commission restated its belief that "there is nothing constitutionally improper about a statute which does no more than facilitate the public's access to programming previously broadcast * *."  FCC Response to Remand (adopted May 24, 1977) at 1.

of public importance is regulated. This fact alone suggests a government purpose intentionally and impermissibly to restrict free speech on the basis of its content. As the Supreme Court recently noted: [23]

> [T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. * * To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." * * *

Moreover, the legislative history of Section 399(b) provides strong support for the view that the purpose of the recording requirement was related to suppression of free expression on issues of public importance. The only extended discussion of the purpose of this statute took place in the context of a colloquy between Senator Robert Griffin, the principal advocate of the recording requirement, who is participating as an *amicus* in this case, and Hartford Gunn, then president of PBS. After the Senator read two letters dealing with ideological balance in public affairs programming on noncommercial television, the exchange continued:

> Senator Griffin: During this committee's consideration of the 1970 Public Broadcasting authorization bill, I offered an amendment which was quickly opposed by many people in Public Television—an amendment which would have

provided that audio tapes of public affairs programs would be maintained for some reasonable period of time and would be available at the expense of the person requesting a copy.

There is the provision in the 1967 act which states that one of the purposes of the act is to facilitate the development of high-quality programs "with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature."

You certainly agree with that part of the act, I would think?

Mr. Gunn: Yes.

Senator Griffin: And you don't want Government censorship of your programs?

Mr. Gunn: No, sir.

Senator Griffin: But it would seem to me that private individuals who are interested in trying to assess the objectivity of those programs should have some way of finding out what was on the air.

Mr. Gunn: I agree, yes, sir.

> \* \* \* \* \* \*

Senator Griffin: If I can just take a few more minutes on this subject, I got interested in this question a few years ago when we were having the debate in Congress on the ABM. As you know, that was a very difficult issue for Members of Congress, and incidentally, it was decided in the Senate by one vote. It is my position, and I realize others don't agree with it, that if we hadn't supported the President on the ABM, he would not have been able to negotiate the SALT agreement. But putting that aside, this program was nationally distributed, and I assume by your organization. It was a very interesting example for me because my chairman of the other party happened

---

**23.** *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). In that case the Supreme Court was confronted with a Chicago ordinance prohibiting all picketing in the vicinity of a school *except* peaceful labor picketing. In declaring the ordinance unconstitutional, the Court saw as the "central problem" the fact that the statute described impermissible picket-

ing "not in terms of time, place, and manner, but in terms of subject matter." *Id.* at 95, 99, 92 S.Ct. at 2292. Time, place, and manner restrictions, the Court reasoned, may be justified on equal protection grounds if tailored narrowly to serve a substantial governmental interest. *Id.* at 99, 101, 92 S.Ct. 2286. Content based discrimination, on the other hand, "is never permitted." *Id.* at 99, 92 S.Ct. 2286.

to agree with me on the ABM, as I recall. Is that right, Mr. Chairman?

Senator Pastore: That's right.

Senator Griffin: I had heard about this program and that it was biased and unbalanced. Unfortunately, I did not get to see it, but, of course, you can't be watching all the channels all the time. At the time, I asked for a transcript or a tape and indicated that I would be glad to pay for whatever expense was involved, but the answer was no, *even though I was a Member of Congress, and even though I was a member of this committee.*

Mr. Gunn: Was that request made of the Public Broadcasting Service or was it made of the producer of the program? I am trying to recall.

Senator Griffin: I can't recall either. In any event, I did not get any help. Frankly, your letter to the Wall Street Journal only keeps me going, because you are going to make these tapes available only to people that you consider have proper credentials in research or journalism.

Now, if you believe that policy is a substitute for my legislation, I don't. *To avoid any kind of Government censorship, you should make programs broadcast over-the-air available to the public as is the case with material that is printed in the newspaper.* It is in the public domain at that point. I don't see how any broadcaster can refuse or make it difficult to find out what has been put on the air.

Mr. Gunn: I agree with you absolutely.

*Public Broadcasting—Hearings on S. 1090 Before the Subcommittee on Communications of the Senate Committee on Commerce,* 93d Cong., 1st Sess. 113–114 (1973) (emphasis added). Later, during House debate on the bill, Congressman Van Deerlin stated:

In addition, section 2 of the proposed legislation stipulates that any station receiving assistance from CPB make audio transcriptions of programs in which any issue of public importance is discussed.

These tapes must be maintained by the station for 60 days, for possible public scrutiny. Of course, no commercial broadcaster is saddled with this requirement—*it comes dangerously close to censorship.* For this reason, I must point out that as far as I am concerned the provision in question is in no way a "hunting license" for the Federal Government. Rather, it is a housekeeping device, which I anticipate will be rarely if ever used.

119 Cong.Rec. 25175 (1973) (emphasis added).

What is initially most striking about this legislative history is its marked contrast to that of the 1967 Public Broadcasting Act. Whereas the Senate Report on the 1967 Act explicitly stated that federal financial assistance "should in *no way* involve the Government in programing or program judgments," and that local stations should be *"absolutely free"* in their broadcasting decisions,[24] Senator Griffin, having been rebuffed in his attempts to secure the tape of an individual program "even though I was a Member of Congress, and even though I was a member of this committee," advocated the recording requirement as a necessary alternative to government censorship of programming. A recording requirement which Representative Van Deerlin, one of its supporters, viewed as "com[ing] dangerously close to censorship" was thus incorporated into an Act whose purpose, according to the original House Report, was to allow the federal government to "provide a source of funds to pay part of the cost of educational broadcasting and not control the final product * * * [to] provide the most effective insulation from Government control or influence over the expenditure of funds."[25]

To be sure, Congress is generally free to change its mind; in amending legislation Congress is not bound by the intent of an earlier body. But it is bound by the Constitution. The legislative purposes of the 1967 Public Broadcasting Act, as stated

---

**24.** S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).

**25.** H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967).

in the Senate and House Reports, reflect not only a prudential judgment that Congress should not involve itself in the programming decisions of local licensees, but also a constitutional judgment that it must not do so. To the extent that Section 399(b) rejects this judgment, and was intended instead to impose the threat of congressional or governmental control over the content of noncommercial public affairs broadcasting, it is based upon a purpose which mandates its invalidation.

### III

We need not, however, rest on this basis alone in invalidating Section 399(b). Since Section 399(b) clearly imposes at least incidental restraints on First Amendment freedoms, it can be upheld only "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial government interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

Thus, even if we assume that enactment of Section 399(b) is within the constitutional power of government, and that the governmental interest in its enactment is unrelated to suppression of free expression, the important and substantial government interest it furthers has not been identified, nor is it shown that Section 399(b)'s incidental restriction on First Amendment freedoms is not greater than is essential to the furtherance of that interest. When we examine Section 399(b) in the light of these *O'Brien* criteria, we are compelled to find the statute and regulations unconstitutional.

### A. *The First Amendment Chill*

The threshold for applying the *O'Brien* tests is, of course, that a statute *does* impose a restraint on First Amendment freedoms. Absent such a restraint, we have no occasion to require that the governmental interest involved be substantial and important, as opposed to merely legitimate, or to examine closely the means employed by the statute to further the stated end. In this case we think this threshold requirement is clearly met—even apart from the actual burdens of compliance with Section 399(b) [26] —by the chilling effect which Section 399(b) imposes on local licensees in their exercise of First Amendment rights.

Government financial support of noncommercial broadcasting itself carries with it dangers of an inhibiting effect on programming. Dr. Frederick Breitenfeld, Executive Director of the Maryland Center for Public Broadcasting, has pointed out that his system, or any other state-owned system, is "less likely" than it would otherwise be to present controversial political programming. In his own case, he said, it would be unlikely that viewers would see a program highly critical of the Maryland General As-

---

**26.** Compliance with § 399(b) may entail some financial burden for those stations which would not otherwise record all of their public affairs programming; they are required by § 399(b) to purchase equipment and devote staff time sufficient to record all such programming. While part of this financial burden may be borne by resort to federal funds, given the statutory limitations on appropriations the fact remains that resources that could otherwise be available for other areas of a licensee's programming and operations will be diverted to assure compliance with the statute. Moreover, the necessity of producing and distributing a large number of copies in a relatively short time period may occasion a serious disruption in a station's operations, particularly where the station is small

and its staff limited. Such disruptions are of course uncertain; none may ever occur. Even so, the risk involved, like the expense of taping itself, renders public affairs programming a more costly undertaking than it would be absent § 399(b).

The FCC itself has recognized the burdens of compliance with § 399(b) in its consideration of whether a similar recording requirement should be applied to commercial licensees; the Commission, finding that the burden involved outweighed any benefits to be secured, decided that commercial licensees should not be subjected to a recording requirement. *Third Report and Order*, Docket 19667, 64 FCC2d 1100, 1113–1114 (1977).

sembly, since the Assembly is the source of two thirds of the system's funding.[27] While some such inhibition may be inevitable in any scheme of government funding, the risk to First Amendment values must be minimized if the scheme is to pass constitutional muster. *See Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In the Public Broadcasting Act of 1967 Congress sought to minimize such risks by ruling out any role for itself in deciding what programs or entities are funded by CPB and by preserving the freedom of local broadcasters to make their own day-to-day programming decisions without any interference by CPB. Section 399(b), on the other hand, enhances such risks by creating a means for government review, on a program-by-program basis, of the contents of every public affairs broadcast of every licensee who has received financial support from either HEW or CPB.

In recommending establishment of CPB as a mechanism for distributing federal funds for programming, the Carnegie Commission recognized the inherent dangers to the free and robust discussion protected by the First Amendment where programs are subject to review on an individual basis by government officials. It emphasized that the purpose of CPB "is not to escape scrutiny but to minimize the likelihood that such scrutiny will be directed toward the day-to-day operations of the sensitive program portion of the Public Television system." Carnegie Commission on Educational Television, *supra,* at 37. This recognition of the risks of program-by-program review is one that has been shared by both the courts and the Federal Communications Commission. The FCC has generally eschewed any such review, *see Accuracy in Media, Inc.,* 43 FCC2d 851 (1953), *aff'd,* 172 U.S.App.D.C. 188, 521 F.2d 288 (1975), and where it must take place, as in enforcement of the fairness doctrine, review has been accompanied by judicially imposed standards and safeguards designed to minimize intrusion on First Amendment values. *See National Citizens Committee for Broadcasting v. FCC,* 186 U.S.App.D.C. 102, 567 F.2d 1095 (1977); *Straus Communications, Inc. v. FCC,* 174 U.S.App.D.C. 149, 530 F.2d 1001 (1976); *National Broadcasting Co., Inc. v. FCC,* 170 U.S.App.D.C. 173, 516 F.2d 1101 (1974), *vacated as moot,* 170 U.S.App.D.C. 252, 516 F.2d 1180 (1975) *(per curiam), cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).

It is true, of course, as the FCC strongly asserts, that Section 399(b) on its face neither creates any new content restrictions on noncommercial licensees nor establishes any new mechanism for enforcement of existing standards on a program-by-program basis.[28] But the fact is that the system of broadcast regulation by Congress and the FCC, as currently structured, provides ample opportunity for substantial chilling of First Amendment freedoms, particularly where relatively small, publicly supported stations are concerned. Section 399(b), in its operation, clearly serves to facilitate those exercises of power and persuasion which create the chill. And while the statute itself contains no new content standards applicable to noncommercial licensees, the expressions of concern and dissatisfaction with the content of noncommercial public affairs programming in the legislative history of this statute suggest that its effect—if not its purpose—is to impose stricter content standards on noncommercial licensees in their public affairs programming.

27. Statement of Dr. Frederick Breitenfeld before the House of Representatives Subcommittee on Communications (Sept. 9, 1976), reported in *Broadcasting* magazine, Sept. 12, 1977, at 24.

28. The FCC's position in this proceeding that "[t]here is simply no clash between Section 399(b) and petitioners' freedom of expression," FCC brief at 16, is to be contrasted with its treatment of similar claims of chilling effect raised by commercial broadcasters during its consideration of whether these broadcasters should be subject to a recording requirement. The FCC found "the concern that the proposed rule might have a chilling effect on free speech and press" one that "cannot easily be dismissed." It did not find it necessary "to reach the constitutional issue," however, since it was "simply * * * not convinced that the public benefits outweigh the costs imposed." *Third Report and Order, supra* note 26, 64 FCC2d at 1113.

Noncommercial licensees, like their commercial counterparts, are subject to regulation and license renewal proceedings by the FCC.[29] This renders them subject as well to a variety of *sub silentio* pressures and "raised eyebrow" regulation of program content. *See* Bazelon, *FCC Regulation of the Telecommunications Press,* 1975 Duke L.J. 213, 215–216. While recent administrations provide ample examples of open forms of such pressure, aimed at "inhibiting \* \* the networks and their professed concern with achieving balance \* \* \* [and] dampen[ing] their ardor for putting on 'loyal opposition' type programs," Memorandum from Charles W. Colson to H. R. Haldeman, September 25, 1970, *quoted in* S.Rep.No.93–981, 93d Cong., 2d Sess. 283–284 (1974), more subtle forms of pressure are also well known. The practice of forwarding viewer or listener complaints to the broadcaster with a request for a formal response to the FCC, the prominent speech or statement by a Commissioner or Executive official, the issuance of notices of inquiry, and the setting of a license for a hearing on "misrepresentations" all serve as means for communicating official pressures to the licensee.[30]

Ability to resist such pressures, and to avoid the chill on future programming which they bring, would seem clearly related to the financial strength and independence of the licensee.[31] While the Washington Post may have little difficulty, even at the possible risk of nonrenewal of its television license,[32] in deciding to continue its vigorous investigation of the Watergate break-in, this decision would be a much riskier and more difficult one for a smaller, less financially secure organization unable to bear the costs of protracted litigation. And if the networks have difficulty in resisting government pressure to shift their programming emphasis, certainly a small station which depends significantly on CPB or HEW—both of which depend in turn upon congressional appropriations—is far more vulnerable.[33]

The vulnerability of noncommercial licensees to official pressures is increased by Section 399(b), for the operation of the taping requirement serves to facilitate the exercise of "raised eyebrow" regulation. Quite simply, it provides a mechanism, for those who would wish to do so, to review systematically the content of public affairs programming; based on such review they may make use of existing means for communicating their displeasure.

In seeking to identify the chilling effect of a statute our ultimate concern is not so much with what government officials will actually do, but with how reasonable broadcasters will perceive regulation, and with the likelihood they will censor themselves to avoid official pressure ·and regulation. Mere passage of a statute which clearly serves the purpose of allowing government officials to review program content on a

---

**29.** *See* 47 U.S.C. §§ 307–309 (1970).

**30.** *See* Bazelon, *FCC Regulation of the Telecommunications Press,* 1975 Duke L.J. 213, 216–217. *See also* 2 E. Barnouw, A History of Broadcasting in the United States 32–33 (1968); Robinson, *The FCC and the First Amendment: Observation on 40 Years of Radio and Television Regulation,* 52 Minn.L.Rev. 67 (1967); Scalia, *Don't Go Near the Water,* 25 Fed.Com. B.J. 111 (1972).

**31.** *See* Bazelon, *supra* note 30, at 238–239.

**32.** "The main, main thing is the Post is going to have damnable, damnable problems out of this one. They have a television station \* \* \* and they're going to have to get it renewed." Taped statement of Richard M. Nixon to H. R. Haldeman and John Dean, Sept. 15, 1972, *quoted in* S.Rep.No.981, 93d Cong., 2d Sess. 149 (1974).

**33.** To be sure, as a theoretical matter Congress may be foreclosed by the First Amendment from enacting legislation or decreasing or conditioning appropriations where its purpose is to control the content of programs broadcast by noncommercial stations. But even apart from separation of powers considerations, so long as other reasons exist to support any such action or inaction, a licensee is unlikely to succeed in an attempt to challenge Congress in the courts. And even if he could ultimately prevail, the costs of mounting such a challenge, like the costs of responding to FCC inquiries or participating in license renewal hearings, as well as the uncertainties involved, independently exert a chilling effect on the licensee's willingness to court official displeasure.

program-by-program basis—and does not clearly serve any other legitimate purpose [34] —is reason enough for local licensees to fear and to dilute their public affairs coverage. For it is one thing for a broadcaster to decide independently to retain recordings of his programming; it is quite another for him to be told by Congress that when the programming concerns issues of public importance he must retain recordings and make them available to the Commission or to any individual who requests them.

But the message conveyed to local broadcasters by Section 399(b) is not confined to passage of the statute itself; it is stated most clearly and articulately in the legislative history preceding enactment of the statute, quoted earlier. As to the question whether it is reasonable or likely for broadcasters to fear that Section 399(b) will be employed by government officials to review the content of individual programs, one need only look to Senator Griffin's remarks that an important stimulus to his introduction of this legislation was his inability to secure a recording of a program on an important national issue which he had heard was "biased and unbalanced." Whatever purpose the Senator might have had in seeking to review this tape, it would certainly not be unreasonable for a station that had aired the program to fear that some form of protest or pressure might be forthcoming if the Senator objected to its contents, and to adjust its future coverage of public affairs to reflect the increased risks involved.

More troubling still are the references in the legislative history to the recording requirement as an alternative to government censorship and as a mechanism "com[ing] dangerously close to censorship." If the recording requirement was intended to and

actually does serve merely as a neutral means of affording access to the public or as some form of "housekeeping device," then one must ask how it could be characterized or considered as an alternative to or as some form of government censorship. The answer to this question lies in Senator Griffin's repeated references, in both the quoted colloquy and elsewhere,[35] to the recording requirement's utility in ensuring strict objectivity by licensees in their public affairs broadcasting. To the extent the recording requirement serves this purpose it will be effecting a new and significant diminution in the broadcasters' First Amendment freedoms in the area of public affairs. For, apart from Section 399(b), there is no requirement that any licensee—commercial or noncommercial—adhere to a standard of strict objectivity and balance in its public affairs programming; all that is required is compliance with the fairness doctrine.

The seemingly stricter "objectivity and balance" standard of Section 396(g)(1),[36] referred to by Senator Griffin, is applicable only to the CPB itself, and even there only to a narrower category of programming dealing with controversial issues. Extension and enforcement of this strict standard against all individual noncommercial licensees with respect to all programming "in which any issue of public importance is discussed," as broadly defined by the FCC,[37] would raise serious constitutional questions, particularly in light of the Supreme Court's cautious approval of the more limited fairness doctrine in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). And yet, without doing so explicitly, Section 399(b) seems effectively to impose this standard on broadcasters who pay heed to the background of the statute. For the unmistakable implication of Section 399(b) and its history is that if

---

34. *See* Part III–B *infra*.

35. *See* Hearings on H.R. 11807 Before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce, 92d Cong., 2d Sess. 242–244 (1972) (remarks of Sen. Griffin). *See also* S.Rep.No. 869, 91st Cong., 2d Sess. (1970).

36. *See* Note, *"Balance and Objectivity" in Public Broadcasting: Fairer Than Fair?*, 61 Va.L. Rev. 643 (1975) (arguing that the balance and objectivity standard of § 396(g)(1) imposes a stricter standard of fairness than that imposed under the fairness doctrine).

37. *See Report and Order, supra* note 2, 57 FCC2d at 21.

public affairs programming by noncommercial licensees is perceived by government functionaries to be anything less than scrupulously objective and balanced, then action may be taken against the licensees or further legislation enacted.

Recognition of this function of Section 399(b)—its effective imposition of a new content standard based in turn on the content of programming—makes clear why Senator Griffin could view a recording requirement as an "alternative to Government censorship" and why Representative Van Deerlin could characterize the requirement as one which "comes dangerously close to censorship." The chill thereby placed on First Amendment freedoms is, without doubt, of the most serious dimensions. And the likelihood that broadcasters will so censor themselves, in view of Section 399(b)'s history and the special vulnerability of noncommercial licensees to government action, is one that cannot be ignored. Even were there no other basis for concluding that this statute carries with it a deterrent effect on vigorous public affairs programming, this aspect alone would lead us to conclude that the First Amendment is properly invoked in this case.

▄▄▄▄ We cannot, of course, specify with any degree of certainty the precise quantity of chill which is or will be produced by Section 399(b). Chilling effect is, by its very nature, difficult to establish in concrete and quantitative terms; the absence of any direct actions against individuals assertedly subject to a chill can be viewed as much as proof of the success of the chill as of evidence of the absence of any need for concern. To be sure, where actual instances of harassment are established, or where past experience with similar regulation yields concrete evidence of a successful chill, the case is a stronger one, and the burden on government to justify its regulation must be heavier. *See NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The absence of such concrete evidence, however, does not mandate dismissal of the claim out of hand; rather, it is the task of the court to evaluate the likelihood of any chilling effect, and to determine whether the risk involved is justified in light of the purposes served by the statute. *See Shelton v. Tucker, supra*, 364 U.S. at 486, 81 S.Ct. 247; *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).[38] In the instant case we think it

**38.** In *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Supreme Court declared unconstitutional an ordinance requiring the names and addresses of individuals who caused handbills to be distributed to be printed on the handbills. In so doing the Court emphasized the "important role in the progress of mankind" which has been played by anonymous publications, relying on examples from English and early American history. As the dissent pointed out quite clearly, 362 U.S. at 69, 80 S.Ct. 536, no proof was introduced that the plaintiff would suffer any form of public hostility if forced to place his name on the handbills.

Similarly, in *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), the Court found a significant chill on First Amendment rights without relying on any specific incidents in the record supporting its conclusion. *Shelton* involved a statute requiring all public schoolteachers to list all their affiliations in order to be hired or retained on the public payroll. While there was evidence in the record supporting the teachers' fears that public disclosure of unpopular affiliations could bring with it pressures for their removal, the Court did not rely on public disclosure as the sole basis for a constitutional burden: "Even if

there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy." 364 U.S. at 486, 81 S.Ct. at 251. The Court cited no concrete evidence in the record or elsewhere for this proposition.

Moreover, *Buckley v. Valeo, supra* note 18, and *Red Lion Broadcasting Co. v. FCC, supra* note 4, relied upon by respondents in arguing that the chill here is "speculative," do not support their conclusion that no First Amendment burden should be recognized in this case and no justification from the Government for this burden required. In *Buckley* the Court rejected the argument that minor parties should be exempt from the disclosure requirements of the Federal Election Campaign Act because of the chill which application of these requirements would impose. It found that "the substantial public interest in disclosure identified by the legislative history of this Act outweighs the harms generally alleged." 424 U.S. at 72, 96 S.Ct. at 660. It should be emphasized that the Court held not that the First Amendment need not be considered, for otherwise a "substantial" government interest would not have been

clear that Section 399(b) carries with it a serious danger of chilling vigorous public affairs programming. The question, then, is whether this danger is justified.

## B. *The Purposes Served by Section 399(b)*

The panel which heard argument in this case initially remanded the record to the Commission for consideration of certain questions raised by petitioners' First Amendment challenges.[39] The first and most critical question, for present purposes, sought the Commission's view as to "what 'important or substantial government interest' is furthered by the recording requirement," citing *United States v. O'Brien, supra*. In response the Commission, after noting that "the legislative purpose of the statute is not entirely clear,"[40] suggested three purposes, which must be examined according to *O'Brien*'s tests.

1. *Oversight of federal funds.* The purpose most strongly and persistently advanced by the Commission is that Section 399(b) "give[s] taxpayers, who provide the bulk of financial support for these stations, a means for reviewing the stations' performance." In the FCC's view the statute thus serves as a "reasonable imposition of accountability" for the expenditure of public funds. Supplemental Memorandum of FCC on Rehearing *En Banc* at 17.

We do not doubt that oversight of the expenditure of federal funds is a substantial and important government objective which might well justify certain incidental restraints on First Amendment rights. In this case, however, it is quite clear that this oversight objective is not one which Section 399(b) logically can be said to further.

First of all, contrary to the FCC's assertion, federal tax dollars *do not* provide the bulk of support to noncommercial licensees. As noted earlier, in fiscal year 1976 only 27.7 percent of total broadcasting income was derived from federal sources.[41]

required, *see United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), but rather that in striking the balance the important public interest served outweighed the dangers of chill as they could then be evaluated.

Finally, in *Red Lion* the Court, in evaluating whether the fairness doctrine, as enforced by the FCC, violated the First Amendment, considered the argument that enforcement would lead to self-censorship by broadcasters. The Court found "at this point" that the "possibility is at best speculative." 395 U.S. at 393, 89 S.Ct. 1794. But it did not merely assert this conclusion on the ground that concrete evidence to the contrary was lacking, as is done here by the Commission; it based it instead on past experience with the fairness doctrine, the statements of broadcasters, and the powers of the FCC. More importantly, the Court in *Red Lion* did not hold that a risk to First Amendment rights imposed no burden of justification on the Government; in upholding the fairness doctrine it emphasized the critical First Amendment values supporting application of the doctrine to protect against the very operation of "private censorship * * * in a medium not open to all." *Id.* at 392, 89 S.Ct. at 1808.

**39.** The questions were:

1. In the language of *United States v. O'Brien*, 391 U.S. 367, 377, [88 S.Ct. 1673, 20 L.Ed.2d 672] (1968), what "important or substantial government interest" is furthered by the recording requirement?

2. Is the governmental interest unrelated to suppression of free expression? *United States v. O'Brien, supra*, 391 U.S. at 377, [88 S.Ct. 1673].

3. Assuming validity of the statute, are there any alternatives as to implementing regulations that would result in a less drastic burden? *See, e. g., United States v. O'Brien, supra*, 391 U.S. at 377, [88 S.Ct. 1673]; *Shelton v. Tucker*, 364 U.S. 479, 488, [81 S.Ct. 247, 5 L.Ed.2d 231] (1960).

**40.** This is, in itself, a serious problem. Where no legislative purpose is clearly articulated, a court must be wary in concluding that the statute was not in fact enacted to suppress free expression but rather was intended to serve other, legitimate purposes. Clearly, if the latter were the case, one might expect the purposes to be named. Indeed, the Supreme Court has in the past refused even to consider suggested legitimate purposes for a statute infringing First Amendment rights where there was no evidence that the enacting legislature had considered them as well. *See Talley v. California, supra* note 38, 362 U.S. at 64, 80 S.Ct. 536. In this case the purposes put forth by the FCC are, at best, tenuously grounded in the legislative history, which is quoted at 192 U.S.App. D.C. at ———— ·————, 593 F.2d at 1112-1113 *supra*.

**41.** *See* note 15 *supra*.

More importantly, application of the recording requirement is not tied to the particular programs which *are* produced with federal funds. The threshold for application of Section 399(b) is that a licensee have received funding either under the facilities grant program or the Public Broadcasting Act after August 1973. On the one hand this means that funding from other federal sources—which amounted to a 19.8 percent of federal funding for noncommercial broadcasters in 1976 [42]—is not subject to Section 399(b)'s oversight. On the other hand, the obligation to record does extend—indefinitely, by the terms of the statute—to all licensees who receive any funding at all from the specified sources. Thus the licensee who accepted a grant to purchase equipment in 1973 and received no other federal funding would be obliged to record all his public affairs programs thereafter, while the licensee, commercial or noncommercial,[43] who is continually federally subsidized apart from Sections 390–399 of the Communications Act is never subject to the requirement.

Moreover, once the licensee has come within the threshold for application of the recording requirement, the statutory classification defining what must be recorded is wholly unrelated to the rationale of oversight of the expenditure of federal funds. There is absolutely no likely or necessary correlation between the content of programming—public affairs or not—and federal funding. Quite clearly, not all publicly funded programs deal with public affairs, nor are all public affairs programs publicly funded. Nor does programming subject to Section 399(b) constitute the bulk of noncommercial broadcasts; most of what these licensees do, with their own and federal funds, escapes scrutiny under Section 399(b).[44]

In practice, then, any intersection between public support of a particular program and the application of Section 399(b) is little more than coincidental. As a result, even assuming that those who receive federal funds may be subject to strict requirements of accountability with respect to expenditure of the funds, the fact remains that Section 399(b) does not further the goals of oversight and accountability except by chance. Certainly, such coincidental furtherance of an objective—even an important and substantial one—cannot satisfy *O'Brien*'s requirement that the regulation or statute actually serve an important or substantial government interest. Moreover, even if we were to assume that the recording requirement does further the interest in accountability, it is clear that Section 399(b) requires licensees to record some programs, which, because wholly unsupported by federal funds, should not be subject to recording in light of the stated purpose. Such "overinclusiveness" of the statute's application is inconsistent with *O'Brien*'s additional requirement that government regulations be no more restrictive than is essential to further the substantial goals served.

The oversight rationale, then, fails to meet *O'Brien*'s tests—and to validate Section 399(b)—on two counts.

2. *Preservation of significant programs.* The second purpose suggested by the FCC in its response to remand is that "such a temporary archive could prove useful to individuals simply desiring to obtain copies to preserve significant programs that sta-

---

**42.** This amount includes funding from such sources as the National Endowments for the Arts and for the Humanities, the Department of Health, Education and Welfare (apart from the Educational Broadcasting Facilities Act), and the National Science Foundation. *See* Group on Analysis and Projection of the Task Force on Long Range Financing, *supra* note 15.

**43.** Clearly, noncommercial stations are not the sole beneficiaries of federal support of broadcasting. By providing and enforcing the exclusive channels and frequencies of commercial stations the Government is providing a benefit to commercial stations which may be far greater than any benefits it provides to noncommercial stations.

**44.** In 1976 programs not subject to § 399(b) accounted for 88.2% of the programs broadcast by public television stations. Corporation for Public Broadcasting and National Center for Educational Statistics, Public Television Programming by Category: 1976 at 34 (Table II.14) (advance ed. 1977).

tions may have broadcast in carrying out their obligations as public trustees."

Initially, we must question whether this objective is a "substantial or important government interest," as required by *O'Brien*. While we do not doubt the desirability of preserving significant broadcasts or maintaining open archives or libraries of programs, we are less certain that this end should be considered sufficiently substantial and important to justify restrictions on First Amendment rights. But we need not decide this question, for it appears that Section 399(b) no more furthers this goal than it did that of federal oversight and accountability.

First, it is clear that "significant" programs are produced by commercial licensees as well as by the noncommercial broadcasters subject to Section 399(b), and the former are no less public trustees than the latter. Second, it is equally clear that "significant" programming and public affairs programming are not coextensive: some educational or entertainment programs, broadcast by both commercial and noncommercial licensees, may be equally or more "significant" than some public affairs programs subject to Section 399(b)'s recording requirement.

Thus Section 399(b) furthers the stated interest only partially—and even then only coincidentally. Many of the most "significant" programs broadcast by public television and radio—and all of those produced by commercial broadcasters—will not be preserved by this statute. Only if a public affairs program broadcast by a licensee receiving federal funds under the Communications Act *happens* to be "significant"—however that term is defined—will the stated objective be served at all. And again, as with the federal oversight objective, the statutory requirement is overinclusive with

reference to the asserted governmental interest. For unless one concludes that all public affairs programs, as broadly defined by the FCC,[45] broadcast by stations subject to Section 399(b) are clearly "significant" and deserving of preservation, then it is inevitable that some "insignificant" programs which need not be preserved will nonetheless be recorded—a result which is at odds with *O'Brien*'s requirement that government regulation be narrowly tailored to meet its substantial ends and impose no restraints unnecessary to these ends.

The second stated objective, then, like the first, is inconsistent with *O'Brien* on at least two counts.

3. *Enforcing objectivity and balance.* The third and final objective suggested by the FCC in its response to remand is that "[t]he recording requirement could be a useful aid for Congressmen or individual members of the public in evaluating the extent to which stations, as well as CPB, are meeting their goals [under Section 396(g)(1)(a)]." Plainly, this objective fails to meet the *O'Brien* tests.

The goal of Section 396(g)(1)(a), "strict adherence to objectivity and balance in all programs * * * of a controversial nature," is applicable to CPB, not to the individual licensees. Section 399(b), on the other hand, is directed to local licensees and is applicable to programs dealing with public issues whether or not they are distributed by CPB and whether or not they are "of a controversial nature." While local noncommercial licensees are subject to the fairness doctrine in their programming on controversial issues,[46] so too are commercial licensees, and the FCC has concluded that Section 399(b) is *not* necessary to enforcement of this obligation.[47]

---

**45.** *See* note 2 *supra.*

**46.** *See Accuracy in Media, Inc. v. FCC,* 172 U.S.App.D.C. 188, 196, 521 F.2d 288, 296 (1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).

**47.** *See Third Report and Order, supra* note 26, 64 FCC2d at 1114:

We * * * do not think that taping news and public affairs programs is necessary to resolve fairness doctrine complaints or other alleged misfeasance on the part of broadcasters. We are satisfied * * * that our present rules can be enforced without these additional requirements.

At best, then, Section 399(b) serves as an overly restrictive means for evaluating CPB's compliance with its statutory mandate. Because local licensees are required to record programs which are not funded by CPB and which do not deal with controversial issues, the statute imposes restraints on First Amendment rights beyond those which are essential to fulfillment of its stated goal. Such unnecessary restriction of First Amendment rights is clearly inconsistent with the requirements of *O'Brien*.

This overly restrictive aspect of Section 399(b)'s operation disappears only if we view the governmental objective as one of enforcing compliance by local licensees with strict standards of objectivity in their own public affairs programming. With respect to this objective, the statute imposes no unnecessary restraints. But if we accept this as the purpose of the statute, then it is clear that we have moved beyond the realm of incidental restraints which can be justified under the *O'Brien* tests to that of regulation aimed at suppressing free speech, which may be justified only by reference to the most compelling government interests.

■ The purposes offered by the Government in support of Section 399(b) quite simply fail to satisfy the requirements established in *O'Brien*. Nor do we reach a different result if, instead of applying *O'Brien*'s stated tests, we balance the government interest served against the First Amendment burden imposed, as has been done in some recent cases.[48] For however much the FCC seeks to minimize the restraint in this case, the First Amendment does not permit us to tolerate even minimal burdens on protected rights where no legitimate government interest is truly being served.

## IV

Finally, we turn to petitioners' equal protection claim. Essentially, petitioners argue that they are denied equal protection of the laws because Section 399(b)'s recording requirement is limited in its application to noncommercial broadcasters receiving federal funds, leaving commercial broadcasters free to record or not as they please. While the FCC did consider extending the recording requirement to commercial broadcasters, it recently concluded that the burdens involved outweighed any benefits of the required recording and declined to impose this obligation on commercial broadcasters.[49]

■ In equal protection challenges the critical question is always "whether there is an appropriate governmental interest suitably furthered by the differential treatment" at issue. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Where the classification drawn by a statute is not itself invidious and where no fundamental rights are affected, it is sufficient that the government interest is legitimate and the classification rationally related to that interest.[50] But where, as here, fundamental rights *are* involved, stricter scrutiny is appropriate. Thus where noncontent-based distinctions are drawn in a statute affecting First Amendment rights, the Supreme Court has held that the government interest served must be "substantial" and the statutory classification "narrowly tailored" to serve that interest if the statute is to withstand equal protection scrutiny.[51]

This equal protection standard is closely related to the *O'Brien* First Amendment tests, already applied in this opinion to Section 399(b). While our focus in equal pro-

48. *See, e. g., Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

49. *Third Report and Order, supra* note 26, 64 FCC2d at 1110–1114.

50. *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

51. *Police Department of Chicago v. Mosley, supra* note 23, 408 U.S. at 99, 101, 92 S.Ct. 2286. *See also Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

tection scrutiny is on the challenged classification, the critical questions asked are the same: whether there is a substantial government interest being served and whether the statute—particularly the challenged classification—is narrowly tailored to serve that interest.

Clearly, the FCC's claim that the recording requirement serves as a means to preserve significant programs cannot support the statute under these tests: even if we consider this interest a substantial one, significant programming is, as noted earlier, produced by commercial stations as well as by the noncommercial licensees subject to Section 399(b), and both are equally trustees of the public. Nor could it be argued that the interest being served is compliance with standards of objectivity or fairness; again, as noted earlier, both commercial and noncommercial licensees are subject to exactly the same fairness standards in their programming. This interest, then, like that in preserving tapes of significant programs, provides no basis for application of the recording requirement only to noncommercial licensees who have received federal funds under Sections 390–399.

Indeed, the only interest advanced by the FCC which even plausibly might justify this distinction is that Section 399(b) serves as a means for federal oversight of the expenditure of federal funds. Our analysis of this objective in the context of the O'Brien tests, however, made clear that application of the recording requirement is in no way tied to expenditure of federal funds on the programs recorded. As a result, the interest in oversight and accountability is served, if at all, only by coincidence. Certainly a governmental interest, no matter

how substantial in and of itself, cannot serve to justify a statutory classification when the interest is not in fact one which is truly furthered by the statute. Moreover, even were this interest in some sense served by the statute as a whole, the O'Brien analysis made clear that it is not one which the classification at issue here, between commercial and noncommercial licensees, is narrowly tailored to further.[52]

Because no substantial governmental interest has been suggested which the distinction between commercial and noncommercial licensees is narrowly tailored to further, we must conclude that the statute is unconstitutional under the Fifth Amendment.

V

In this case the spectre of government censorship and control hovers, not only over public broadcasting, but over all broadcasting. For if this legislation is constitutional as to public broadcasting, similar legislation as to all broadcasting is standing in the wings. If the Government can require the most pervasive and effective information medium in the history of this country to make tapes of its broadcasting for possible government inspection, in its own self-interest that medium will trim its sails to abide the prevailing winds.

For the above stated reasons Section 399(b) is unconstitutional and the rules and regulations of the Federal Communications Commission which implement it are vacated.

*So ordered.*

BAZELON, Circuit Judge, concurring.

Petitioners challenge the constitutionality of Section 399(b) and the rules promulgated

---

**52.** Under the statutory scheme, while all commercial licensees are free from the recording requirement, all noncommercial licensees that have, after 1973, received federal funding under §§ 390–399 are thereafter required to record. The commercial-noncommercial distinction thus drawn ignores both the time period during which federal funds were provided and the use made of these funds by the licensee. As a result a licensee who has not received any federal funding since 1974, or one who has received no support for programming,

would nonetheless be required to record. At the same time a licensee receiving federal financial support from sources other than those specified in § 399(b), *see* note 42 *supra,* or a commercial broadcaster receiving federal assistance by virtue of his license, *see* note 43 *supra,* is under no obligation to record. These examples leave no question that whatever purpose the statute as a whole might be said to serve, the distinction challenged here is not narrowly tailored to serve objectives of oversight or accountability.

thereunder by the FCC on both First Amendment and Equal Protection grounds. Judge Wright's opinion makes a persuasive case that § 399(b) places substantial burdens on noncommercial broadcasters and presents the risk of direct governmental interference in programming content in violation of the First Amendment. Indeed, this argument is a strong one and might well prevail. But however strong that challenge is, it is even clearer that § 399(b) violates the Equal Protection guarantee of the Fifth Amendment, and it is thus unnecessary to decide whether the chill imposed by this statute is sufficient to require its invalidation on First Amendment grounds alone. Because § 399(b) not only "touches upon" fundamental First Amendment freedoms, but does so by classifications formulated explicitly in terms of the content of speech, we must examine the challenged regulation to insure that it is precisely tailored to serve legitimate governmental interests. "Of course, the equal protection claim in this case is closely intertwined with First Amendment interests . . . . As in all equal protection cases, however, the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). As the opinions of Judge Wright and Judge Robinson convincingly establish, when § 399(b) is measured against its intended objectives, it fails even to satisfy the demands of limited Equal Protection scrutiny. Hence, we must conclude that the statute is a constitutionally impermissible means of furthering any or all of its ostensible goals.

Accordingly, I concur in the judgment of the court and join in Parts I and IV of Judge Wright's opinion and in the opinions of Judge Wright and Judge Robinson to the extent that they reflect these views.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in part and concurring in the judgment:

It certainly may seem curious that broadcasters, whose mission is to display their creations to the widest possible audiences, are striving so hard to keep certain of their programs from becoming viewable more than once. This extensive litigative effort bespeaks, then, deep concern that the superficially innocuous recording requirement at issue will jeopardize cherished journalistic independence. Petitioners seek to overturn that requirement under the First Amendment, and Judge Wright's opinion presents a persuasive analysis of the chill that Section 399(b)[1] and the implementing regulations could forebode for First Amendment expression. Nonetheless, I think our decision is more firmly grounded on the Fifth Amendment's pledge of equal protection of

---

1. 47 U.S.C. § 399 (Supp. V 1975) states in relevant part:

(a) No noncommercial educational broadcasting station may engage in editorializing or may support or oppose any candidate for political office.

(b)(1) Except as provided in paragraph (2), each licensee which receives assistance under sections 390 to 399 of this title after August 6, 1973 shall retain an audio recording of each of its broadcasts of any program in which any issue of public importance is discussed. Each such recording shall be retained for the sixty-day period beginning on the date on which the licensee broadcasts such program.

(2) The requirements of paragraph (1) shall not apply with respect to a licensee's broadcast of a program if an entity designated by the licensee retains an audio recording of each of the licensee's broadcasts of such a program for the period prescribed by paragraph (1).

(3) Each licensee and entity designated by a licensee under paragraph (2) which retains a recording under paragraph (1) or (2) shall, in the period during which such recording is required under such paragraph to be retained, make a copy of such recording available—

(A) to the Commission upon its request, and

(B) to any other person upon payment to the licensee or designated entity (as the case may be) of its reasonable cost of making such copy.

(4) The Commission shall by rule prescribe—

(A) the manner in which recordings required by this subsection shall be kept, and

(B) the conditions under which they shall be available to persons other than the Commission,

giving due regard to the goals of eliminating unnecessary expense and effort and minimizing administrative burdens.

the laws.[2] Accordingly, I join in Parts I and IV of Judge Wright's opinion and in the judgment of the court, and elaborate herein my reasons for doing so.

### I

Section 399(b) draws classifications among broadcasters in two ways. First, it applies only to those licensees who receive financial assistance from certain specific federal sources; more importantly, it applies only to those broadcasters who air public affairs programs.[3] Petitioners, who are among the class burdened, do not argue that they are politically powerless[4] or have historically been subjected to unequal treatment,[5] and obviously they do not comprise a "discrete and insular" minority.[6] Thus no suspicions are raised simply by the nature of the group around whose collective neck the legislated millstone has fallen.

But while the affected class itself raises no eyebrows, the recording obligation Section 399(b) imposes on a differential basis calls for closer investigation.[7] We have here a mandate that is specifically related to speech. In a sense, the recording directive facially impacts on First Amendment interests no greater than do many other more commonplace regulatory commands that are similarly expensive and time-consuming to obey.[8] This one, however, varies expressly and proportionally with the level of communicative activity of a particular kind, which is not the case with such general edicts as those summoning broadcasters to submit reports and pay taxes.[9] Noncommercial licensees who emphasize public affairs in their programming bear the brunt of the recording rule, and resultantly the statute and the supplementing regulations on their face could operate as a disincentive to programming of that type. Beyond that, even, petitioners con-

2. "The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903–1904, 48 L.Ed.2d 495, 506–507 (1976); see *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228 n.2, 43 L.Ed.2d 514, 519 n.2 (1975) (approaches under the two amendments are "precisely the same"); *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884, 887 (1954) (it is "unthinkable" that the Federal Government would have a lesser responsibility than the states in assuring equal protection).

3. See note 1 *supra*.

4. See *Foley v. Connelie*, 435 U.S. 291, 294, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287, 291 (1978), citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152–153 n.4, 58 S.Ct. 778, 783–784 n.4, 82 L.Ed. 1234, 1241–1242 n.4 (1938); *Mathews v. Lucas*, 427 U.S. 495, 506 & n.13, 96 S.Ct. 2755, 2762–2763 & n.13, 49 L.Ed.2d 651, 661 & n.13 (1976); *Johnson v. Robison*, 415 U.S. 361, 375 n.14, 94 S.Ct. 1160, 1169–1170 n.14, 39 L.Ed.2d 389, 402–403 n.14 (1974). A central purpose of the equal protection guarantee is to shield the politically impotent from capricious action by the majority. *E. g., Kramer v. Union Free School Dist.*, 395 U.S. 621, 628, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583, 590 (1969); *Hobson v. Hansen*, 269 F.Supp. 401, 507–508 (D.D.C. 1967), aff'd as mod. sub nom. *Smuck v. Hobson*, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

See also *Katzenbach v. Morgan*, 384 U.S. 641, 652–653, 86 S.Ct. 1717, 1724–1725, 16 L.Ed.2d 828, 836–837 (1966).

5. *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583, 590 (1973); *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16, 40 (1973).

6. *United States v. Carolene Prods. Co., supra* note 4, 304 U.S. at 152–153 n.4, 58 S.Ct. at 783–784 n.4, 82 L.Ed. at 1241–1242 n.4; see, e. g., *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520, 525 (1976); *Examining Bd. of Eng'rs v. Flores de Otero*, 426 U.S. 572, 602, 96 S.Ct. 2264, 2281, 49 L.Ed.2d 65, 85 (1976); *Gordon v. Lance*, 403 U.S. 1, 5, 91 S.Ct. 1889, 1891, 29 L.Ed.2d 273, 276 (1971).

7. *See, e. g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 667, 86 S.Ct. 1079, 1081–1082, 16 L.Ed.2d 169, 172 (1966); *Griffin v. Illinois*, 351 U.S. 12, 18–19, 76 S.Ct. 585, 590–591, 100 L.Ed. 891, 898–899 (1956); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942).

8. *Cf. Zurcher v. Stanford Daily*, 436 U.S. 547, 566–567, 98 S.Ct. 1970, 1981–1982, 56 L.Ed.2d 525, 540–542 (1978).

9. Compare *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

tend that we should look to what they allege is the requirement's improper purpose—facilitation of governmental pressure on noncommercial broadcasters. In support of their argument, they cite remarks of Senator Griffin, quoted in Judge Wright's opinion,[10] as indicative of a congressional willingness to exact recording as the *quid pro quo* for avoiding more direct governmental censorship.

It cannot be gainsaid that the existing regulatory framework provides dangerous opportunities for abuse.[11] But the call for recording adds little more to that peril; it simply makes marginally easier what could happen in any event.[12] Whether the heightened menace posed by Section 399(b) imposes a chill on First Amendment freedom sufficient to require its invalidation on that ground is a question I see need to not address. Though Judge Wright's opinion states a persuasive case that the section

"was intended . . . to impose the threat of congressional or government control over the content of noncommercial public affairs broadcasting," [13] I think it jurisprudentially sounder to avoid whenever possible—as it is here—a direct search for improper motives of the legislature in passing a law, or of the executive in implementing it. In any event, I would rely upon a probe of that kind to overturn governmental action only when the exploration has uncovered clear and convincing proof.[14]

Moreover, petitioners' contention runs afoul of the sensible proposition that it benefits no one to invalidate automatically and totally every law that might do some good merely on the ground that it might also be used to do some bad. It must be remembered that this litigation is not an effort to enjoin an instance of the misuse of Section 399(b) feared by petitioners. Rather, we are asked to invalidate on its face the entire

---

**10.** 192 U.S.App.D.C. ——, ——, 593 F.2d 1112, 1113 (Wright, C. J. (Wright Op.)).

**11.** See generally Bazelon, *FCC Regulation of the Telecommunications Press*, 1975 Duke L.J. 213.

**12.** As video tape recorders become more ubiquitous, it is hard to imagine why this recording requirement would be at all necessary to a plot to deter exercise of First Amendment rights. In fact, since the rules require only an audio tape, anyone with an inexpensive tape recorder —or, indeed, anyone who watched the program in question or heard about it—would have no need for the aid of § 399(b).

**13.** 192 U.S.App.D.C. at ——, 593 F.2d at 1114 (Wright Op.). That opinion presents a rather convincing case through use of the sources for discovering improper purpose that the Supreme Court has suggested: historical background, sequence of events leading up to the challenged action, whether the challenged action represents a substantive departure from prior policy, and legislative and administrative history. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267 268, 97 S.Ct. 555, 564 ·565, 50 L.Ed.2d 450, 465--466 (1977).

Ironically, Judge Wright's analysis is strengthened by Judge MacKinnon's dissent, which admits—indeed, hopes—that § 399(b) will deter "the broadcast of irresponsible, inaccurate and slanted utterances. . . . " 192 U.S.App.D.C. at ——, 593 F.2d at 1153 (MacKinnon, J. dissenting opinion (MacKinnon Op.)) Even were it not menacing to the very heart of the First Amendment to assume that some gov-

ernmental body should assure the caliber and accuracy of speech, the problem is that broadcasters can only guess what might be labeled "slanted," and thus "will trim [their] sails to abide the prevailing winds." 192 U.S.App. D.C. at ——, 593 F.2d at 1123 (Wright Op.); see *First Nat'l Bank v. Bellotti*, 435·U.S. 765, 785 n.21, 98 S.Ct. 1407, 1420 n.21, 55 L.Ed.2d 707, 723 n.21 (1978). The natural desire to tack to the safest course will inevitably result in indoctrination for the governmental status quo, something even the dissents believe Congress wanted to avoid.

**14.** Reliance upon individual expressions of legislative purpose is often unsafe because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . ." *United States v. O'Brien*, 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672, 684 (1968). For that reason, I would prefer to rely upon other types of evidence—such as the absence of a reasonable fit between the means chosen and any legitimate end—that at least indicate what the governmental body as a whole had or did not have in mind when making its decision. See *Washington v. Davis*, 426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597, 615 (1976) (Stevens, J., concurring) ("[f]requently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor[, f]or normally the actor is presumed to have intended the natural consequences of his deeds").

provision on the basis of apprehensions that it might sometimes—though of course it might never—be abused. Judicial review to assure the constitutionality of governmental action is not so blunt an instrument that ordinarily we must upset a legislative or administrative scheme in advance of a "reasonable probability" of perversion of power.[15] Normally we can await a real threat of the disease and then intercept it, or at least carefully excise it from the body politic without necessarily maiming the patient.

Hence, I must reject petitioners' plea to subject Section 399(b) to the strictures of the First Amendment. That I would reserve for statutes facially impinging on First Amendment interests and those being or likely to be perverted to do so. Yet, because the burden of this legislation is assigned on the basis of the nature of the expression, and because suspicions about its real objective and potential use have been voiced—either of which might serve to deter broadcasters' willingness to air controversial programs—one cannot shed entirely his First Amendment cares.[16] So, any exploration into whether Section 399(b) satisfies the demands of Fifth Amendment equal protection must be conducted in light of these somber First Amendment concerns. Indeed, petitioners argue that equal protection summons careful scrutiny to assure that the requirement is "narrowly tailored" to serve a "substantial governmental interest."[17] The invitation is tempting,[18] but I believe Section 399(b) cannot withstand even more restrained equal protection review, and hence I feel no need to measure it against any more stringent standard.

## II

Having ascertained the class and the interests affected, the next step is to determine whether "the classifications drawn in [the] statute are reasonable in light of its purpose."[19] This is a quest first entailing identification of Section 399(b)'s ostensible legitimate objectives. That will be no mean feat here, since Congress has indicated only vaguely what ends or mixture of ends the recording requirement was intended to serve.[20]

**15.** *Reporters Committee for Freedom of the Press v. American Tel. & Tel. Co.,* 192 U.S. App.D.C at —, —— — —— n.36, 593 F.2d at 1075, 1076–1077 n.36 (1978) (concurring opinion).

**16.** In this regard, it makes no difference whether the governmental action absolutely prohibits a certain category of speech or simply restricts it by imposing additional burdens on those who wish to engage in it. *Lamont v. Postmaster General,* 381 U.S. 301, 309, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398, 403–404 (1965); see, *e. g., James v. Strange,* 407 U.S. 128, 134–140, 92 S.Ct. 2027, 2031–2034, 32 L.Ed.2d 600, 607–610 (1972) (recoupment statute might deter use of appointed counsel by indigents accused of crime); *Bullock v. Carter,* 405 U.S. 134, 144, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 100 (1972) (election fees "closely scrutinized" because of "impact" on right to vote).

**17.** *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 101–102, 92 S.Ct. 2286, 2293–2294, 33 L.Ed.2d 212, 220 (1972); see *id.* at 99 n.6, 92 S.Ct. at 2292 n.6, 33 L.Ed.2d at 219–220 n.6, quoting *Cox v. Louisiana,* 379 U.S. 536, 556 n.14, 85 S.Ct. 453, 465 n.14, 13 L.Ed.2d 471, 485 n.14 (1965) (content-based distinction "points up the fact that the statute reaches beyond mere traffic regulation to restrictions on expression"); accord *First Nat'l Bank v. Bellotti,* *supra* note 13, 435 U.S. at 784–785, 98 S.Ct. at 1420, 55 L.Ed.2d at 723 ("the legislature is constitutionally disqualified from dictating the subjects about which persons may speak"); Wright, *Politics and the Constitution: Is Money Speech?,* 85 Yale L.J. 1001, 1009 (1976) ("[t]he main evil against which vigorous First Amendment scrutiny is designed to guard is content discrimination—discrimination based on the message itself").

**18.** Whether the First Amendment itself imposes a requirement of equal treatment of similarly-situated speakers would be an academic inquiry, for the test applied to governmental action would be the same. See generally Karst, *Equality as a Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20 (1975).

**19.** *McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222, 228 (1964); see, *e. g., Mathews v. Lucas, supra* note 4, 427 U.S. at 508 n.14, 96 S.Ct. at 2763–2764 n.14, 49 L.Ed.2d at 662–663 n.14 ("appellees, in order to make their case, must ultimately rely upon the asserted failure of the legislative product adequately to fit the purported legitimate aim").

**20.** 192 U.S.App.D.C. at —— – ——, 593 F.2d at 1118–1119 (Wright Op.).

The legislative history of Section 399(b) is sparse indeed. As Judge Wright observes, some statements during the legislative debates point to an undifferentiated intent to censor,[21] but that is not all that surfaces at times. There are also hints that program recording was meant to serve the objectivity and balance directive of Section 396(g)(1)(A) [22] or the ban on editorializing in Section 399(a).[23] The Commission as respondent and Senator Griffin as amicus curiae suggest that Section 399(b) was directed additionally toward preservation of significant programming or oversight of federal expenditures. No reference to these latter two are seen in the legislative history, and courts cannot rely upon aims that apparently never crossed the minds of the legislators,[24] particularly when confronted by the possibility of danger to a fundamental interest. Even when Section 399(b) is analyzed in relationship to all these supposed goals,[25] however, it emerges as an odd mechanism for producing any of the results for which some would give it credit.

## A. *Preservation of Significant Programming*

If this be its purpose,[26] then Section 399(b) is grossly and indisputably underinclusive. Noncommercial licensees who have not accepted federal funds or who broadcast little or no public affairs programming—as well as all commercial licensees—undeniably air many "significant" presentations.[27] Absent any legislative or adminis-

21. *Id.* at ———–———, 593 F.2d at 1111–1113.

22. See notes 46–47 *infra.*

23. See note 1 *supra.*

24. See *Califano v. Goldfarb*, 430 U.S. 199, 212–217, 97 S.Ct. 1021, 1030–1032, 51 L.Ed.2d 270, 280–283 (1977) (plurality opinion).

25. No one argues that we should uphold the taping requirement as a means to enforce § 399(a)'s prohibition of editorial statements. Section 399(b)'s physical location in the Act might suggest that it was intended as that, and the original proposal in 1970 expressly stated that relationship. S. 3558, 91st Cong., 2d Sess. (1970). Curiously, however, no one argues that the recording requirement was designed to facilitate oversight of § 399(a). See Dissenting Opinion of Leventhal, J. (Leventhal Op.) at note 47. This reticence is due no doubt to uncertainty over whether § 399(a) could itself withstand constitutional scrutiny, for it is not a chill but a hard freeze and its legislative history is replete with troubling statements. *E. g.*, Public Television Act of 1967: Hearings on H.R. 6746 & S. 1160 Before the House Comm. on Interstate and Foreign Commerce, 90th Cong., 1st Sess. 641 (1967) (Representative Springer) ("[t]here are some of us who have very strong feelings because they have been editorialized against"); 113 Cong.Rec. 26399 (1967) (Representative McClure) (public television "might well . . . crusade for my opponent in next year's election"); *id.* at 26391 (Representative Keith, speaking of a program televised in his district) ("[i]t is conceivable that . . . [the program] could . . . have adversely affected my candidacy for re-election"; "[t]his kind of film is the kind of program that we must guard against"); *id.* (Representative Jeolson) (incumbents would be "sitting duck[s]"

and "the right of editorializing should be very, very carefully scrutinized"); *id.* at 26389 (Representative Devine) ("I understand that there is one educational TV station out on the west coast that a bunch of 'hippies' are running"; "[s]omeone has suggested that it would indeed be amazing to hear the type of analysis they are making").

The Senate, which did not have a similar provision in the bill it had passed, acceded to the House in conference "when it was explained that the prohibition against editorializing was limited to providing that no noncommercial educational broadcast station may broadcast editorials *representing the opinion of the management of such station.*" H.R.Rep. No.794, 90th Cong., 1st Sess. 12 (1967) (statement of House managers), reprinted in [1967] U.S.Code Cong. & Admin.News 1772, 1835 (emphasis supplied). The debate on the House bill thus must be given "special significance . . . as an expression of the purpose the new statute was intended to serve." *United States v. Bailey*, 189 U.S.App.D.C. 206, 210 n.30, 581 F.2d 984, 988 n.30 (1978), citing *Steiner v. Mitchell*, 350 U.S. 247, 254, 76 S.Ct. 330, 334–335, 100 L.Ed. 267, 273 (1956). And the limitation emerging from the conference hardly serves to dispel qualms about how the proscription on such editorializing might fare constitutionally.

26. Preservation itself might well be only a means, not an end, and thus one might still inquire, "why preserve any of these programs?"

27. The statute is also overinclusive since quite a few public affairs programs presented by noncommercial broadcasters who have pocketed federal funding are likely to be less than memorable.

trative findings on this score, I am left to common sense, and it simply strains credulity to think that the burdened class is responsible for a decisionally conclusive portion of "significant" programming.[28] Thus I must turn elsewhere to find a legislative goal explaining the distinction.

## B. *Oversight of Federal Funding*

At first blush, this end seems related to a means, such as Section 399(b), that draws a distinction on the basis of receipt of federal funds, but careful analysis is needed before the law can be approved as furthering fiscal oversight. Surely more *can* be expected of those who drink deepest at the public trough, but that which is expected must be related to governmental provision of assistance; the existence of a fulcrum such as public aid is not the equivalent of a constitutionally-valid reason for applying leverage.[29] The rubric of funding oversight can be invoked only when the vehicle chosen seems designed to give assurance that the funds are being properly spent, and that is not the case here.

The recording requirement has no sensible correlation with this supposed target. The burdens of Section 399(b) fall most oppressively on those who most often broadcast public affairs programs, not on those who most extensively receive federal money. Consequently, the requirement is both over- and underinclusive: it applies to all public affairs presentations by federally subsidized noncommercial broadcasters, even though most of such programming is unaided by federal funding;[30] it does not apply to any other type of programs, though millions of federal dollars are expended for their presentation.[31] In short, while oversight of federal expenditures is a laudable end, the Section 399(b) means has, in Judge Wright's words, at most but an occasionally coincidental relationship to it.[32]

## C. *Assuring Objectivity and Balance*

This purported mission comes from Section 396(g)(1)(A), which instructs the Corporation for Public Broadcasting (CPB) to adhere to a policy of "objectivity and balance in all programs . . . of a controversial nature."[33] The fairness doctrine, which requires all broadcasters to cover public issues and to present conflicting points of view, is somewhat similar.[34] Enforcement of this latter duty, however, is hardly the objective of Section 399(b), for the Commission has determined that a recording requirement is not needed therefor.[35] Section 399(b), moreover, would be

**28.** Since there is no indication that the affected class, in proportion to *its size, is* responsible for any greater quantity of significant programming than unaffected commercial broadcasters, the under- and overinclusiveness of the statute cannot be justified on the ground that it would be administratively difficult to harness the means more closely to the purpose.

**29.** See, e. g., *Elrod v. Burns,* 427 U.S. 347, 359, 96 S.Ct. 2673, 2682–2683, 49 L.Ed.2d 547, 557 (1976); *Shapiro v. Thompson,* 394 U.S. 618, 629–631, 89 S.Ct. 1322, 1328–1329, 22 L.Ed.2d 600, 612–613 (1969); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965, 970–971 (1963); *Speiser v. Randall,* 357 U.S. 513, 518–519, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460, 1468 (1958).

**30.** Only about one-fourth of the funds spent in fiscal year 1976 by noncommercial broadcasters were supplied by the Federal Government. See 192 U.S.App.D.C. at —— ——— & n.15, 593 F.2d at 1108–1109 & n.15 (Wright Op.).

**31.** In fiscal year 1976, almost one-fifth of all federal funding for noncommercial broadcasting came from sources—such as the National Endowment for the Arts—that do not trigger the recording requirement. See *Id.* at —— & n.42, 593 F.2d at 1119–1120 & n.42 (Wright Op.). Consequently, § 399(b) is significantly underinclusive for those funds alone.

**32.** *Id.* at ——, 593 F.2d at 1122 (Wright Op.).

**33.** 47 U.S.C. § 396(g)(1)(A) (1970).

**34.** See generally *National Citizens Comm. for Broadcasting v. FCC,* 186 U.S.App.D.C. 102, 567 F.2d 1095 (1977). But see 192 U.S.App. D.C. at ——, 593 F.2d at 1136 (Leventhal dissenting opinion (Leventhal Op.)).

**35.** *Petition for Rulemaking to Require Broadcast Licensees to Maintain Certain Program Records,* 64 F.C.C.2d 1100, 1114 (1977); 192 U.S.App.D.C. at —— & n.47, 593 F.2d at 1121 & n.47 (Wright Op.).

irrationally underinclusive if directed toward that end since it does not apply to commercial licensees. Assuring compliance with Section 396(g)(1)(A) is more pertinent to Section 399(b), but that certainly does not explain the differential treatment it accords.

The policy of objectivity and balance is, to begin with, a prescription only for CPB in its efforts to develop and upgrade public broadcasting.[36] When Section 399(b) was first considered, CPB was already retaining copies of every program it funded, so Congress knew there was no problem in checking on CPB's performance.[37] The objectivity and balance requirement of Section 396(g)(1)(A) does not in terms apply to individual noncommercial licensees in airing their public affairs programs—even though federally funded. Section 399(b), on the other hand, is not self-limited even to licensees assisted by CPB grants, but encompasses anyone who at any time has received public broadcasting funds under the Act from any federal source.[38] It is surely curious that the objectivity and balance directive applies only to CPB and not individual licensees while the recording requirement, which is said to be rationally related, applies only to the individual licensees and not CPB. Thus the taping requirement does not seem linked in any way to an effort to promote objectivity and balance,

and much less could it be rationally related to that end.

Some of my dissenting brethren nonetheless accept that objective as Section 399(b)'s goal, and are able to avoid prohibitive overinclusiveness therein by the simple expedient of narrowing the statutory language to match that goal—by defining the means to fit the end. Judge Leventhal reads that critical Section 399(b)(1) phrase, "each licensee which receives assistance . . . after the date of [its] enactment", as referring to "any program" and not to "each licensee."[39] I agree, however, with Judge Wright that we cannot adopt such a constrictive construction if it would do violence to evident legislative intentions respecting scope of the recording requirement.[40] "Of course, if it can be lawfully done, our duty is to construe the statute so as to render it constitutional. But this does not imply, if the text of an act is unambiguous, that it may be rewritten to accomplish that purpose."[41] As Justice Holmes once put it, in construing a statute the judicial "function is merely academic to begin with—to read English intelligently—and a consideration of consequences comes into play, if at all, only when the meaning of the words used is open to reasonable doubt."[42] Hardly more plainly could Congress have made its wish known when in Section 399(b)(1) it said that "each *licensee* which receives assistance"

---

**36.** See 47 U.S.C. § 396(g)(1)(A) (1970).

**37.** See S.Rep.No.869, 91st Cong., 2d Sess. 8 (1970), reprinted in [1970] U.S.Code Cong. & Admin.News pp. 3954, 3960.

**.38.** See note 1 *supra;* —— U.S.App.D.C. at ——, 593 F.2d at 1120 (Wright Op.).

**39.** Note 1 *supra;* 192 U.S.App.D.C. at ——, 593 F.2d at 1148 (Leventhal Op.).

**40.** Id. at ——, 593 F.2d at 1125 (Wright Op.); *Yamataya v. Fisher (The Japanese Immigrant Case),* 189 U.S. 86, 101, 23 S.Ct. 611, 614–615, 47 L.Ed. 721, 726 (1903).

**41.** *Howard v. Illinois Cent. R. R. (The Employers' Liability Cases),* 207 U.S. 463, 501, 28 S.Ct. 141, 146, 52 L.Ed. 297, 310 (1908); accord, *United States v. Harris,* 106 U.S. 629, 642, 1 S.Ct. 601, 611–612, 27 L.Ed. 290, 295 (1883);

*see Commissioner v. Gottlieb,* 265 U.S. 310, 313, 44 S.Ct. 528, 529, 68 L.Ed. 1031, 1033 (1924) ("if the plain words of the statute are against such a conclusion, leaving no room for construction, the courts have no choice but to follow it, without regard to the consequences"); *United States v. Ewing,* 184 U.S. 140, 149, 22 S.Ct. 480, 483, 46 L.Ed. 471, 474 (1902) (courts may not adopt a construction that "violates the clear directions of the law" even to avoid "great injustice"; "we cannot for that reason alter its terms . . . and thus ourselves enact instead of construing the law"); *Jay v. Boyd,* 351 U.S. 345, 357, 76 S.Ct. 919, 927, 100 L.Ed. 1242, 1254 (1956) ("we must adopt the plain meaning of a statute, however severe the consequences").

**42.** *Northern Secs. Co. v. United States,* 193 U.S. 197, 401, 24 S.Ct. 436, 468, 48 L.Ed. 679, 726 (1904) (dissenting opinion).

shall abide the taping requirement for its public affairs programs.[43]

Even if the statutory phrase in question were somewhat ambiguous, I could not accept the reading suggested as a reasonable version of its intended meaning. That interpretation apparently has not occurred to any of the numerous lawyers in this litigation, or to the Commission or any of those who made presentations to it regarding the taping rule, or to Senator Griffin in his amicus brief. More importantly, strong indications of congressional design are all to the contrary. As Judge Wright notes, Judge Leventhal's construction is irreconcilable in three particulars with Section 396(g)(1)(A).[44] And a contemporaneous administrative construction—the Commission's, in the rulemaking proceeding we are now reviewing—is diametrically opposed to Judge Leventhal's interpretation and yet was not objected to by a single legislator.[45]

Referring to admittedly ambiguous statements by two Members of Congress—which at most "reveal[ ] one purpose"[46] but do not exclude others,[47] and do not speak directly

**43.** See *George Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265, 1270 (1933); 192 U.S.App.D.C. at ——, 593 F.2d at 1150 (MacKinnon Op.) ("Judge Leventhal's limiting construction . . . improperly narrows the plain meaning of [the] statute").

**44.** Wright Op. at note 4; see *Achilli v. United States,* 353 U.S. 373, 379, 77 S.Ct. 995, 998, 1 L.Ed.2d 918, 922 (1957) (coherence must be given to all portions of the statute); *Gayler v. Wilder,* 51 U.S. (10 How.) 477, 496, 13 L.Ed. 504, 512 (1850) (same).

**45.** See *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–340, 38 L.Ed.2d 287, 294–295 (1973); *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165–166 (1971); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944).

**46.** 192 U.S.App.D.C. at ——, 593 F.2d at 1143 (Leventhal Op.). These two statements are there seen as the only relevant legislative history, *id.,* at —— ——, 593 F.2d at 1141–1143, but more can be gleaned. When the statute was first considered in 1970, the Senate Report noted that CPB already had copies of all programs it funded and then, indicating that the proposed recording requirement went well beyond codifying that practice, stated in the very next sentence that the proposal would "require noncommercial educational broadcast stations which received assistance under Title II of the Public Broadcasting Act to keep . . . audio recordings . . . of programs they broadcast involving issues of public importance . . . ." S.Rep.No.869, *supra* note 37, at 8, [1970] U.S.Code Cong. & Admin.News at 3960. The use of the past tense "received," and the fact that the report modifies "programs" only with "involving issues of public importance," show to my satisfaction that the broad language used in the Act was not in any wise the result of congressional misdraftsmanship. Further probative information is found in the Conference Report, which states that the 1970 bill was rejected partly because of a feeling that the recording requirement should be even broader: "Questions were also raised as to why [the requirement] should be limited in [its] application to public broadcast stations receiving Federal grants under title III of the Communications Act of 1934." H.R.Rep.No.1466, (Conf. Rep.) 91st Cong., 2d Sess. 3 (1970) (statement of House managers), reprinted in [1970] U.S. Code Cong. & Admin.News, pp. 3963, 3964; see *id.* at 4, [1970] U.S.Code Cong. & Admin. News, at 3964 ("the managers on the part of the House agree that legislation similar to the recordkeeping provisions in the Senate bill, but applicable to all broadcast stations, should be the subject of the hearings in the next session of Congress").

Perhaps even more telling legislative history emanates from a statement by Senator Griffin, sponsor of § 399(b), in 1972 hearings identifying two of the section's objectives as making noncommercial broadcasters "more responsive to local needs" and as monitoring compliance with § 399(a)'s prohibition of editorializing. See *Financing for Public Broadcasting—1972: Hearings on H.R.11807, 7443 & 12808* before the Subcomm. on Communications and Power of the House Comm. on Interstate and Foreign Commerce, 92d Cong., 2d Sess. 242–243 (1972). Although the Senator also mentioned the requirement of objectivity and balance, *id.,* his statement lessens the possibility that enforcement of § 396(g)(1)(A) was the one and only purpose of § 399(b).

**47.** Judge Leventhal's dissenting opinion ignores the fact that other purposes, such as those for which respondents and Senator Griffin as amicus contend—or even less legitimate objectives, such as that feared by Judge Wright, see test *supra* at note 10—might *also* have been in contemplation and might have caused the means chosen to be broader than any single aim approved by that dissent. *Cf.* A. Bickel, The Least Dangerous Branch 224–225 (1962). If that is the case, then Congress did intend the broad construction demanded by the plain language.

to the scope of Section 399(b)—Judge Leventhal's dissent concedes that the main reason for the judicial draftsmanship it proposes is an effort to avoid constitutional susceptibility.[48] But surely "a court may not exercise legislative functions to save the law from conflict with constitutional limitation."[49] And if statutes must always be narrowed to the scope tolerated by permissible goals, every judicial decision overturning a law on grounds of overinclusiveness of persons not similarly situated was wrongly decided.[50] Just months ago, the Supreme Court rejected a proffered objective for a

statute, concluding that the argument was "belied . . . by the provisions of the statute, which are both under- and over-inclusive."[51] Moreover, if a statute can be constricted in the face of plain language and clear congressional intent, why should courts refuse to expand a statute to eliminate undercoverage?[52] Though indubitably we must strive to avoid declaring a statute infirm, it is no less an invasion of the legislature's province to undertake to rewrite a law in accordance with one's view of a proper objective in the field. And though we may feel that what Congress did is

Judge Leventhal admits that, at least in the analytical framework seen as required in this case, the court's task does not extend to a search for objectives that have "not surfaced in congressional deliberations," 192 U.S.App.D.C. at ——, 593 F.2d at 1146 (Leventhal Op.) and we are on even weaker ground in reading the statute to reflect a purpose that its express terms indicate was not the only one that actually spurred the legislature to action. As I noted earlier, see note 14 *supra,* I think it generally safer to base a conclusion in regard to the legislature's real ends on the means it selected—which indirectly but more reliably would indicate what moved a majority of the decisionmakers—as opposed to speculations on whether two legislators accurately portrayed a consensus of the whole body in their oral comments on the bill. See *Mathews v. Lucas, supra* note 4, 427 U.S. at 508 n. 14, 96 S.Ct. at 2763–2764 n. 14, 49 L.Ed.2d at 662–663 n. 14 ("[w]e are not bound to agree with the [Government's] description of the legislative design if the legislative history and *structure of the provisions themselves belie it*") (emphasis supplied); *Weinberger v. Wiesenfeld, supra* note 2, 420 U.S. at 648, 95 S.Ct. at 1233, 43 L.Ed.2d at 524–525. If the purpose suggested by Judge Leventhal really did lead to this legislation and we invalidate it on equal protection grounds for overinclusiveness, Congress will still be free to reenact it in a narrower version. That outcome would have the advantage of enabling Congress to face directly the First Amendment implications of its action. Congress might then decide, on either constitutional or policy considerations, against oversight of the editorial decisions involved in particular broadcasts. See 192 U.S.App.D.C. at ——, 593 F.2d at 1146 (Leventhal Op.) ("[s]ound constitutional principles demand that Congress carefully consider the justification for a statute touching on First Amendment interests").

That course would also avoid another problem raised by Judge Leventhal's necessarily heavy reliance on congressional use of the appropriations process to oversee the objectivity

of CPB-funded programs. *Id.* at · , 593 F.2d at 1138–1139 (Leventhal Op.); see *Network Project v. Corporation for Pub. Broadcasting,* 183 U.S.App.D.C. 70, 82, 561 F.2d 963, 975 (1977), *cert. denied,* 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). It is that very mechanism of funding that allows official pressure to be brought to bear on broadcasters to propagandize or to reflect particular political viewpoints. To avoid that pressure, Congress is once again examining other means of funding that would guarantee more independence. See *Broadcasting,* July 3, 1978, at 32.

**48.** 192 U.S.App.D.C. at ——, 593 F.2d at 1146 (Leventhal Op.); see *id.* at — ·, 593 F.2d at 1145 ("the literal terms of § 399(b) do not limit the taping requirement to programs which are subject to the standards of § 396(g)(1)(A)").

**49.** *Yu Cong Eng v. Trinidad,* 271 U.S. 500, 518, 46 S.Ct. 619, 623, 70 L.Ed. 1059, 1067 (1926).

**50.** *E. g., Weinberger v. Wiesenfeld, supra* note 2; *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Rinaldi v. Yeager,* 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

**51.** *National Bank v. Bellotti, supra* note 13, 435 U.S. at 793, 98 S.Ct. at 1424, 55 L.Ed.2d at 728.

**52.** To do that would undercut decisions invalidating statutes on the ground that they do not include all those similarly situated with respect to the statutory objective. *E. g., Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1975); *McLaughlin v. Florida, supra* note 19; *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); *F. S. Royster Guano Co. v. Virginia,* 253 U S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

unwise or even absurd, we may not "ignore the ordinary meaning of plain language." [53]

Judge Leventhal's chosen approach, furthermore, bypasses the equal protection problem only through a direct confrontation with the issue of congressional power to control the content of communications that it has had a part in financing, an issue this court has steered clear of on at least two occasions.[54] And while I do not reach it under my view of this case,[55] I think it

much more difficult than the dissenters apparently do.[56] The objectivity and balance requirement is justified, according to the dissents, by the exigency of assuring against governmental pressure on CPB to fund programs espousing partisan views.[57] Though legitimate fears of governmental propagandizing might justify restrictions *on the Government* or on CPB to safeguard against exertions of that sort—and there are quite a few such restrictions in the Public Broadcasting Act [58]—it might not so

---

**53.** *TVA v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117, 133 (1978).

**54.** See *Network Project v. Corporation for Pub. Broadcasting, supra* note 47, 183 U.S.App.D.C. at 82, 561 F.2d at 975; *Accuracy in Media, Inc. v. FCC,* 172 U.S.App.D.C. 188, 196–197, 521 F.2d 288, 296–297, *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1975).

**55.** In light of Judge Leventhal's characterization of my position, see —— U.S.App.D.C. at ——, 593 F.2d at 1149 (Leventhal Op.), I reemphasize that I do not suggest that the Government may not seek to prevent use of its funds on onesided programs. Nor do I reach the constitutionality of an attempt, in effect, to purchase specific programs as opposed to an effort to open up a forum but only to certain voices, and I perceive no occasion to decide which is the case here. My major point is that the recording requirement is not reasonably related to the goal of assuring that CPB properly doles out the monies that have been entrusted to it. I raise questions about the propriety of that goal simply to support my view that Judge Leventhal's approach does not achieve the intended objective of avoiding difficult constitutional questions. See *id.* at , 593 F.2d at 1147.

**56.** Compare *Gambino v. Fairfax County School Bd.,* 564 F.2d 157 (4th Cir. 1977), *aff'g per curiam,* 429 F.Supp. 731 (E.D.Va.1977) (school newspaper, though established and funded by school board, is a public forum, thus school board may not ban publication of controversial article); *Bazaar v. Fortune,* 476 F.2d 570, *aff'd,* 489 F.2d 225 (5th Cir. *en banc* 1973), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (because state university had recognized student magazine as generally available forum, it may not censor particular articles unless otherwise in accordance with First Amendment requirements). See also *Schiff v. Williams,* 519 F.2d 257, 260–261 (5th Cir. 1975); *Trujillo v. Love,* 322 F.Supp. 1266, 1270 (D.Colo.1971); *Korn v. Elkins,* 317 F.Supp. 138, 143 (D.Md.1970) (three-judge district court); *Antonelli v. Hammond,* 308 F.Supp. 1329, 1336 (D.Mass.1970). The Federal Government's

provision of some financial assistance to noncommercial broadcasters surely does not convert them into governmental instrumentalities—such as the Voice of America—created by the Government as the means for its communication, and of which it is of course the editor.

I am not persuaded by Judge MacKinnon's argument that restrictions on expression are sustainable here on the ground that noncommercial licensees "hold[ ] [themselves] out to the public as acting in the public interest and not for commercial purposes (that is, functioning for impartial public motives)." 192 U.S. App.D.C. at ——, 593 F.2d at 1153 (MacKinnon Op.). That theory apparently is based solely on the circumstance that these licensees do not seek to make a profit, and thus stands the now discredited commercial speech doctrine, see *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), on its head and leaves only profit-making enterprises within the protective sphere of the First Amendment. A countless number of the organizations in this country regularly voicing their views—on the airwaves and otherwise—are noncommercial and hold themselves out as actors in the public interest as they see it. Under Judge MacKinnon's rationale, the Government would be able to censor any expression by these groups that it did not itself perceive to be in the public interest.

**57.** 192 U.S.App.D.C. at ——, 593 F.2d at 1140 (Leventhal Op.); see *id.* at ——, 593 F.2d at 1151 (MacKinnon Op.). Judge Leventhal bolsters his perception of the focus of congressional concern by highlighting the possibility that CPB will use public funds to further its own political philosophy. *See id.* at ——, 593 F.2d at 1149 (Leventhal Op.). But even that purpose does not explain the imposition of the recording requirement on broadcasters instead of on CPB, especially since CPB already retains copies of the programs it funds. See note 46 *supra.*

**58.** "Congress [has] erected numerous statutory safeguards against partisan abuses." *Network Project v. Corporation for Pub. Broadcasting,*

easily validate rules affecting *the broadcaster's* editorial decisions. Provisions calculated to stop governmental or CPB officials themselves from trying to influence private broadcasters would not only combat the real problem more squarely, but also less intrusively on First Amendment rights,[59] than would those that order broadcasters to air only approvable programs.

Even if experience should prove that such restraints could not stop all governmental attempts to dominate CPB funding decisions or CPB efforts to influence editorial decisions, the fairness doctrine—which applies to public broadcasters [60]—and perhaps also the First Amendment itself [61] might assure the presentation of points of view conflicting with those officially coerced. This manner of dealing with the spectre of official influence—advancing an argument for the other side instead of banning all viewpoints save those hewing to the middle of the road—might not only avoid unnecessary censorship of the noncommercial broadcaster when his onesided program truly reflects his own ideas, but simultaneously might promote the First Amendment policy of encouraging "uninhibited, robust, and wide open" debate on public issues.[62] Preoccupation with the mischief feared should not be permitted to obscure the historical fact that " 'the remedy of silence is generally not the way of the first amendment.' "[63]

## III

Neither a particular proper purpose nor any amalgam of legitimate aims provides a

---

*supra* note 47, 183 U.S.App.D.C. at 81, 561 F.2d at 974. The Act expressly prohibits any federal agency or official from interfering with CPB or any noncommercial licensee, 47 U.S.C. § 398(2) (1970); see also ---- U.S.App.D.C. at  · , 593 F.2d at 1137–1138 (Leventhal Op.), and "[t]he plain purpose of Section 398 is to prevent any governmental body from influencing CPB in a manner calculated to turn it into a governmental spokesman." *Network Project v. Corporation for Pub. Broadcasting, supra* note 47, 183 U.S.App.D.C. at 82, 561 F.2d at 974. The Commission itself is specifically enjoined from censoring any broadcaster, 47 U.S.C. § 326 (1970), and various other provisions seek to guarantee to public broadcasting the "maximum possible freedom from government or political interference or control." 113 Cong.Rec. 12986 (1967) (Senator Pastore); see 47 U.S.C. § 396(a)(6), (f)(3) (1970). "For one conspicuous example, [CPB] board membership is limited to no more than eight out of the authorized fifteen from the same political party," *Network Project v. Corporation for Pub. Broadcasting, supra* note 47, 183 U.S.App.D.C., at 82, 561 F.2d at 974; see 47 U.S.C. § 396(a)(6) (1970), and as a further protection against governmental influence CPB and the Public Broadcasting Service, which are not authorized to broadcast programs themselves, may not own or control noncommercial stations. 47 U.S.C. § 396(g)(3) (1970).

**59.** See *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960).

**60.** *Accuracy in Media, Inc. v. FCC, supra* note 54, 172 U.S.App.D.C. at 195, 521 F.2d at 295.

**61.** See Note, *Constitutional Ramifications of A Repeal of the Fairness Doctrine,* 64 Geo.L.J. 1293, 1306–1314 (1976) (public's First Amendment right to receive information might require presentation of "issues or points of view that have not received adequate coverage" when governmental action is involved in broadcasting).

**62.** *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964). The public is entitled to "receive suitable access to social, political, esthetic, moral and other ideas and experiences," and that right "may not constitutionally be abridged either by Congress or the FCC." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–1807, 23 L.Ed.2d 371, 389 (1969). Thus the Court indicated strongly that the proper response to the dilemma of scarce frequencies is to push the doors open to all viewpoints, not to close them to all but one "neutral" voice: "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Id.*

**63.** Canby, *The First Amendment and the State as Editor:* 1127 (1974), quoting Van Alstyne, *The First Amendment and Implications for Public Broadcasting,* 52 Texas L.Rev. 1123, *the Suppression of Warmongering Propaganda in the United States: Comments and Footnotes,* 31 Law & Contemp.Prob. 530, 535 (1966); see *Whitney v. California,* 274 U.S. 357, 375–376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1106 (1927) (concurring opinion) ("the fitting remedy for evil counsels is good ones"; "[b]elieving in the power of reason as applied through public discussion, [the framers of the First Amendment] eschewed silence coerced by law").

sound explanation for the classification and means chosen in Section 399(b). Consequently, the statutory recording requirement and the rules implementing it must give way to the demands of equal protection. That conclusion is strengthened when we recall that Section 399(b) tends to discourage broadcast expression on issues of public importance and thus to that extent at least disserves "the First Amendment goal of achieving 'the widest possible dissemination of information from diverse and antagonistic sources.' " [64] While the absence of an acceptable connection between Section 399(b) and any valid governmental function certainly suggests that Judge Wright may be correct in the thesis that the taping mandate was actually intended to facilitate an unlawful end,[65] it is enough for me that there is no basis for a finding that the requirement reasonably relates to any objective to which the Government permissibly can aspire,[66] and no rational justifica-

tion has been shown for the disparate treatment it metes out to noncommercial broadcasters who have been aided by federal funding. Accordingly, I concur in so much of Judge Wright's opinion as espouses this view, and in the judgment today pronounced by the court.

LEVENTHAL, Circuit Judge, with whom TAMM, Circuit Judge, concurs:

This case presents a challenge to § 399(b) of the Federal Communications Act, and to the rules promulgated pursuant to that section by the Federal Communications Commission.[1] Section 399(b) requires any noncommercial educational television or radio station that receives federal funding to make audio recordings of all programs in which any issue of public importance is discussed.[2] These recordings must be maintained for sixty days and made available at cost to any person who requests them.

**64.** *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 795, 98 S.Ct. 2096, 2114, 56 L.Ed.2d 697, 716 (1978), quoting *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–1425, 89 L.Ed. 2013, 2030 (1945); see note 63 *supra*. Paradoxically, public affairs programming is at the very core of the role envisioned for noncommercial broadcasting. See S.Rep.No.222, 90th Cong., 1st Sess. 7 (1967), reprinted in [1967] U.S.Code Cong. & Admin.News, pp. 1773, 1778 ("[p]articularly in the area of public affairs your committee feels that noncommercial broadcasting is uniquely fitted to offer in-depth coverage and analysis which will lead to a better informed and enlightened public"); H.R.Rep.No.572, 90th Cong., 1st Sess. 10 (1967), reprinted in [1967] U.S.Code Cong. & Admin.News, pp. 1799, 1800–1801 ("[w]ho can estimate the value to a democracy of a citizenry that is kept fully and fairly informed as to the important issues of our times").

**65.** The legislature is seldom if ever so inept that it cannot fit the chosen means to its real end, particularly where a court can readily see ways to do so. Consequently, a poor fit may well indicate that the legislature had some other goal at least partly in mind. See Perry, *Constitutional "Fairness": Notes on Equal Protection and Due Process,* 63 Va.L.Rev. 383, 386 (1977). Since the Government undoubtedly will endeavor to present to the court every legitimate purpose the statute might possibly serve, substantial over- or underinclusiveness may betray a legislative ability intelligently to relate the means to ends, which included some unstated,

illegitimate purpose. See *Note, Legislative Purpose, Rationality, and Equal Protection,* 82 Yale L.J. 123, 128 (1972). In this case, for instance, if one works backward, the only purpose the means can realistically suit includes that of facilitating manipulation of federal funding to discourage presentation of unacceptable points of view on controversial issues.

**66.** *Cf. Hampton v. Mow Sun Wong, supra* note 2, 426 U.S. at 103, 96 S.Ct. at 1905, 48 L.Ed.2d at 508–509.

**1.** For the rules pursuant to § 399(b), see FCC, *Report and Order,* 57 F.C.C.2d 19 (1975).

**2.** 47 U.S.C. § 399(b)(1), (2) (Supp. V 1975):

(b)(1) Except as provided in paragraph (2), each licensee which receives assistance under sections 390 to 399 of this title after August 6, 1973 shall retain an audio recording of each of its broadcasts of any program in which any issue of public importance is discussed. Each such recording shall be retained for the sixty-day period beginning on the date on which the licensee broadcasts such program.

(2) The requirements of paragraph (1) shall not apply with respect to a licensee's broadcast of a program if an entity designated by the licensee retains an audio recording of each of the licensee's broadcasts of such a program for the period prescribed by paragraph (1).

The petitioners, noncommercial educational broadcast licensees, press First and Fifth Amendment claims. As a predicate for these, they contend that Congress has no valid interest in recordings of public affairs programs broadcast by noncommercial stations, particularly where no recording requirement has been imposed on commercial licensees. They argue that the taping requirement is an instrument of censorship and will chill the airing of public issues by noncommercial stations.

In brief summary our view is this: Under the Public Broadcasting Act of 1967,[3] Congress appropriates funds for the production of programs to be broadcast by noncommercial stations. Every program or series of programs of a controversial nature is required to maintain a stringent standard of "strict adherence to objectivity and balance." That standard is more rigorous than that applicable to licensees generally under the fairness doctrine, which provides a loose standard of general balance in a licensee's overall programming and has no requirement for individual programs.

Congress reserved for itself the oversight responsibility of assuring, primarily through reports and review of appropriations, that federally funded programs conform to the strict objectivity and balance standard. This is a legitimate and substantial government interest. Construed in light of its purpose and context, the minimal audio taping requirement of § 399(b) is a permissible auxiliary of this congressional responsibility. The oversight does not abridge First Amendment freedom.

The Act does not apply to commercial stations, but this does not mark an invalid classification. There is no corresponding congressional interest in a taping requirement for commercial licensees, which do not broadcast programs funded under the Act.

## I. CONGRESSIONAL RESERVATION OF REVIEW OF THE "STRICT OBJECTIVITY AND BALANCE" OF CPB–FUNDED PROGRAMS

The Public Broadcasting Act of 1967 (the "Act") reflected Congress's commitment to the development of a vital, nationwide noncommercial broadcasting system. It embodied three major legislative objectives: (1) the development of more broadcast facilities devoted to noncommercial programming; (2) the encouragement of educational and cultural programs of high quality; and (3) the better understanding of the instructional uses of broadcast media.[4]

This case concerns the second objective. The first objective was to be accomplished by extending and improving the matching funds program established by the Educational Television Facilities Act of 1962.[5] Congress recognized, however, that the development of facilities would only set the stage. More high quality programs were also needed.[6] To meet that objective Congress established the Corporation for Public Broadcasting (CPB).

In 1967 the Carnegie Commission on Educational Television recommended that Congress create an independent, private, nonprofit corporation to channel federal funds into public broadcasting. Its report, *Public Television: A Program for Action*, concluded that such an entity was essential if public broadcasting's freedom of expression were to coexist with substantial federal support.[7] An independent corporation would serve as an institutional buffer, insu-

---

3. Act of Nov. 7, 1967, Pub.L. No. 90–129, 81 Stat. 365, *as amended*, 47 U.S.C. §§ 390–99 (Supp. V 1975).

4. S.Rep.No.222, 90th Cong., 1st Sess. 2 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin. News, pp. 1772, 1773. The third objective is not pertinent to this case.

5. Act of May 1, 1962, Pub.L. No. 87–447, tit. III, 76 Stat. 64, *as amended*, 47 U.S.C. §§ 390–395 (Supp. V 1975).

6. H.R.Rep.No.572, 90th Cong., 1st Sess. 16 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1799, 1806. *See* 47 U.S.C. § 396(a) (Supp. V 1975) (Congress's declaration of policy).

7. Carnegie Commission on Educational Television, Public Television: A Program for Action 33–35 (1967).

lating local stations from the political interference or pressure that might otherwise accompany federal funding.[8]

Congress shared the Carnegie Commission's concern about the potential for abuse inherent in federal support of public broadcasting. The House report on the Public Broadcasting Act echoed the Commission's rationale for the creation of an independent nonprofit corporation:

> How can the Federal Government provide a source of funds to pay part of the cost of educational broadcasting and not control the final product? That question is answered in the bill by the creation of a nonprofit education broadcasting corporation. . . . It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds.[9]

Similarly, the Senate Report concluded:

> An independent entity supported by Federal funds is required to provide programs free of political pressures.[10]

The Act reflects this congressional commitment to the freedom of public broadcasting stations. CPB was instructed to carry out its activities to assure this "maximum freedom" from "interference with or control of program content." [11] Local stations were to remain the "bedrock' of public broadcasting.[12] Their autonomy and ability to respond to the needs and desires of their communities were to be enhanced, not suppressed, by the creation of CPB. Thus CPB would assist in making programs available to stations, but the individual stations would continue to determine what programs would be broadcast.[13]

Congress also sought to ensure that federal funds would not create a propaganda machine that could be manipulated by any political party or ideological clique. Congress wanted a funding institution that would remain accountable to and responsive to all the American people. Thus it created a corporation that was independent,[14] yet limited by statutory safeguards designed to ensure responsible management and political insulation.[15]

8. The Commission believed so strongly in the need for a buffer between the government and recipients of federal funding that it concluded that it "would be most reluctant to recommend the other parts of its plan unless the corporate entity is brought into being." *Id.* at 5.

9. H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1799, 1805.

10. S.Rep.No.222, 90th Cong., 1st Sess. 4 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin. News, pp. 1772, 1775.

11. Section 396(g)(1)(D), 47 U.S.C. § 396(g)(1)(D) (1970), authorizes CPB to "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the noncommercial educational television or radio broadcast systems and local stations from interference with or control of program content or other activities."

12. S.Rep.No.222, 90th Cong., 1st Sess. 7 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin. News, pp. 1772, 1778; H.R.Rep.No.572, 90th Cong., 1st Sess. 17, 18 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1799, 1807–1808.

13. Congress expected CPB to provide program assistance to local stations in three principal ways: (1) grants and contracts to help support local programming by local stations; (2) grants and contracts for the production of programs by local stations for more than local use; and (3) the creation of programs which would be made available to local stations. H.R.Rep.No. 572, 90th Cong., 1st Sess. 10 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1799, 1800.

14. 47 U.S.C. § 396(b) (1970).

15. Board members are appointed by the President with the advice and consent of the Senate. 47 U.S.C. § 396(c)(1) (1970). No more than eight of the fifteen Board members may be from the same political party. *Id.* No Board members may be employees of the United States. *Id.* § 396(c)(2). No political tests may be used in CPB personnel actions and decisions. *Id.* § 396(e)(2). CPB may not support any political party or candidate for election to public office. *Id.* § 396(f)(3). And CPB may not own or operate any broadcasting station, network or interconnection facility. *Id.* § 396(g)(3).

As the keystone in the structure that it designed, Congress placed itself in a direct and continuing relationship with CPB by imposing on CPB annual reporting[16] and auditing requirements.[17] Congress did not establish the trust fund recommended by the Carnegie Commission.[18] The Carnegie Commission had urged that CPB be financed by an excise tax on television sets, the revenue to be channeled to CPB through a trust fund. The Commission regarded Congress's ordinary budgetary and appropriations procedures as "not consonant with the degree of independence essential to Public Television."[19] Congress, however, perceived the appropriations process, and its role in that process, as necessary to assure CPB's accountability and to safeguard against its capture by a self-serving group. Congressional oversight through the appropriations process would achieve this end without governmental interference in ongoing programming operations.[20]

The debates reflected the emphasis, in both Houses and on both sides of the aisle, that Congress placed on its role vis-a-vis CPB and the problem of political abuse:

> If Congress maintains close scrutiny and carries out its oversight function as it should, I think the problem can be kept in manageable proportions.[21]

> [I]f, as time goes on, we have occasion to feel that there is a slanting, a bias, or an injustice, we instantly and immediately can do something about it. First, we can make very uncomfortable, and give a very unhappy experience to, the directors of the corporation. Second, we can shut down some of their activities in the Appropriations Committee and in the appropriating process of Congress . . . . The corporation is much more readily accessible . . . to the Congress, if it is desired to correct any injustice or bias which might appear.[22]

> The fear of government control of programming was recurrent during consideration of this bill by my committee . . . . I believe we were successful in adding amendments which—along with a reasonable degree of vigilance on the part of Congress—will prevent this corporation from becoming a Government propaganda tool.[23]

> [W]e will create a monster only if we fail in our responsibility to keep it from becoming a monster . . . . Provision is made in the bill . . . for constant review by Congress of the activities of the corporation and the conduct of the program.[24]

---

**16.** A detailed and comprehensive annual report must be submitted annually to the President for transmittal to Congress. 47 U.S.C. § 396(i) (Supp. V 1975).

**17.** CPB's accounts are to be audited annually by an independent accountant, 47 U.S.C. § 396(*l*)(1)(A), and the audit results are to be included in the annual report. *Id.* CPB may also be audited by the General Accounting Office, § 396(*l*)(1)(A), and the audit results are to be submitted to Congress. *Id.* § 396(*l*)(1)(B), (*l*)(2)(B).

**18.** Carnegie Commission on Educational Television, *supra* note 7, at 68–73.

**19.** *Id.* at 69.

**20.** Congress has not been unaware of the tension between annual appropriations and freedom from government control. It succeeded in passing a long-range financing plan with the Public Broadcast Financing Act of 1975, Pub.L. No. 94–192, §§ 2–4, 89 Stat. 1099, which authorized a five-year appropriation for CPB. A new statutory provision was included in the Act which required CPB officers and directors to be available to testify annually before appropriate congressional committees. 47 U.S.C. § 396(i) (Supp. V 1975). The Senate Report on the Act noted: "Even with long-term Federal financing, the Corporation remains fully accountable to the public and to the Congress for its use of public funds. This section will provide the opportunity for annual Congressional review of the Corporation and its activities in any manner Congress believes proper." S.Rep.No. 447, 94th Cong., 1st Sess. 13 (1975), *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 2206, 2218.

**21.** 113 Cong.Rec. 26391 (1967) (remarks by Rep. Anderson).

**22.** *Id.* at 13003 (remarks by Senator Cotton).

**23.** *Id.* at 26394 (remarks by Rep. Brotzman).

**24.** *Id.* at 26395–96 (remarks by Rep. Kuykendall).

Congress did not assume authority to direct or interfere with CPB's day-to-day programming decisions. What Congress contemplated was a reserved power, an ability to alter the level of appropriations if CPB's overall performance strayed from statutory mandates.[25]

Many of the activities Congress expected CPB to undertake were specifically authorized in the Act.[26] Prominent was the authority to fund educational programs for broadcast by noncommercial licensees. Section 396(g)(2)(B) empowers CPB

> to contract with or make grants to program production entities, individuals, and selected noncommercial educational broadcast stations for the production of,

and otherwise to procure, educational television or radio programs for national or regional distribution to noncommercial educational broadcast stations.[27]

CPB was instructed to maintain especially high standards for the programs it would obtain with federal funds. Section 396(g)(1)(A) provides that such programs are to be "of high quality, obtained from diverse sources, . . . with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature." [28] This specification of "strict adherence to objectivity and balance," applicable to each program (or series of programs) created with federal funds, reflects a more rigorous requirement than

25. "It is to be admitted that the Congress of the United States can refuse to appropriate the money because it is dissatisfied with the type of program that has been initiated. . . . But this idea that the Congress of the United States is reserving unto itself the privilege to pass upon each program is a fallacy, because . . . [i]t is stated in the law authorizing the money to be appropriated that there shall be no interference." *Hearings on S.1160 Before the Subcommittee on Communications of the Senate Committee on Commerce,* 90th Cong., 1st Sess. 125–26 (1967) (remarks of Senator Pastore). Senator Pastore also noted, "We don't have to repeat the appropriation if we feel this is a failure. This is all subject to the scrutiny of the Congress of the United States . . . ." *Id.* at 123.

26. These activities include publicizing, establishing an interconnection system, raising funds, conducting research, and establishing a library. 47 U.S.C. § 396(g) (1970).

27. Payments could also be made to local stations to aid in financing their programming costs. *Id.* § 396(g)(2)(C).

28. The full text of subsection (1)(A) of 47 U.S.C. § 396(g), which sets forth the authority of the Corporation for Public Broadcasting, is as follows:

> (g) Purposes and activities of the Corporation; powers under the District of Columbia Nonprofit Corporation Act.
> (1) In order to achieve the objectives and to carry out the purposes of this subpart, . . . the Corporation is authorized to—
> (A) facilitate the full development of educational broadcasting in which programs of high quality, obtained from diverse sources, will be made available to noncommercial educational television or radio broadcast stations, with strict adherence to objectivity and

balance in all programs or series of programs of a controversial nature; . . .

In addition to program grants, CPB provides generalized support to noncommercial licensees: *e. g.,* technical support, funds for the establishment of interconnection networks; funds for scholarships and fellowships; and unrestricted block community service grants. Its "community service" block grants are allocated among stations by a formula based on income and population. *See generally Annual Report of the Corporation for Public Broadcasting for Fiscal Year 1974,* H.Doc. No. 58, 94th Cong., 1st Sess. (1975).

The "strict adherence to objectivity and balance" standard appears only in subsection (1)(A) of § 396(g), and hence is a mandate to CPB only as to activities by which programs are "made available" to noncommercial stations. This must be read broadly to include instances where CPB provides only part of the funds for a program. But it does not apply to the other paragraphs of § 396(g)(1), such as (B) and (C), which do not involve programs as such but concern general aid to noncommercial licensees. Section 396(g)(2)(C) authorizes CPB to make general operating grants as well as program grants to local stations.

In view of the congressional instruction that CPB carry out its functions so as to "most effectively assure the maximum freedom" of noncommercial licensees, *see* note 11 *supra,* and the location of the strict adherence standard in the paragraphs of the CPB charter adopted to define CPB's authority, we cannot fairly discern a legislative intent to stretch that standard into a back-handed mandate controlling all noncommercial licensees. The strict objectivity and balance mandate applies when CPB makes programs available to noncommercial licensees, and these licensees are governed at other times by the fairness doctrine.

that imposed by the fairness doctrine on licensees generally.[29] There is no need to itemize the differences in standards. It suffices here to point out that § 396(g)(1)(A), even after it was liberalized in the conference committee to permit the objectivity and balance requirement to be satisfied by a series of programs instead of each individual program,[30] is more rigorous than the fairness doctrine, which requires only that a licensee's overall programming result in balanced presentation of controversial issues of public importance.[31] The fairness doctrine thus incorporates a looser standard of rough overall balance for a licensee as contrasted with a standard of adherence to strict objectivity and balance for each program (or series).

Public affairs programming by noncommercial educational stations was deemed "uniquely fitted to offer [the] in-depth coverage and analysis which [would] lead to a better informed and enlightened public." [32] Congress was eager to encourage such programs, yet it recognized that they presented a great danger of political bias or propaganda. The elevated standards of objectivity and balance were designed to forestall the use of federal funds for partisan expression.[33]

This court has fully respected Congress's reservation to itself of the critical role of overseeing compliance with the mandate embodied in § 396(g)(1)(A). We upheld the FCC's determination that it had no authority to monitor compliance with § 396(g)(1)(A). *Accuracy in Media, Inc. v. FCC*, 172 U.S.App.D.C. 188, 521 F.2d 288 (1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). And in *Network Project v. Corporation for Public Broadcasting*, 183 U.S.App.D.C. 70, 561 F.2d 963 (1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 56 L.Ed.2d 770 (1978), we refused to find an implicit private right of action under the Act because we determined that Congress did not intend any judicial assist-

**29.** *Accuracy in Media, Inc. v. FCC*, 172 U.S. App.D.C. 188, 196, 521 F.2d 288, 296 (1975) *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976); *see* Note, *"Balance and Objectivity" in Public Broadcasting: Fairer than Fair?*, 61 Va.L.Rev. 643 (1975).

**30.** H.R.Rep.No.794 (Conf.Rep.), 90th Cong., 1st Sess. 13 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1834, 1836: "As so modified [by the House amendment], each program in a series need not meet the test of objectivity and balance, but the series, when considered as a whole, must."

**31.** The fairness doctrine looks "to the general balance of a station's programming." *Hale v. FCC*, 138 U.S.App.D.C. 125, 127, 425 F.2d 556, 558 (1970).

**32.** S.Rep.No.222, 90th Cong., 1st Sess. 7 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin. News, pp. 1772, 1778; H.R.Rep.No.572, 90th Cong., 1st Sess. 10, *reprinted in* [1967] U.S. Code Cong. & Admin.News, pp. 1799, 1800–01. *See also* Carnegie Comm'n on Educational Television, *supra* note 7, at 95–96:

*Contemporary Affairs*

Public Television can extend our knowledge and understanding of contemporary affairs. Its programming of the news should grow to encompass both facts and meaning, both information and interpretation. It should be historian, in addition to being daily journalist. Its program should call upon the intellectual resources of the nation to give perspective and depth to interpretation of the news, in addition to coverage of news day by day.

\* \* \* \* \* \*

Programs should assess the broad significance of a news item: the mine disaster, the Supreme Court decision, the new tax, the labor strike, the scientific discovery. The bare reporting of incidents is not sufficient to meet the responsibilities we see for Public Television. Programs should find ways to show us the context of incidents, the past and present from which they spring, the impact they may make on tomorrow.

**33.** A typical statement of Congress's purpose in passing § 396(g)(1)(A) is the following by Representative MacDonald of the House Interstate and Foreign Commerce Committee: "[T]he Corporation must not become overwhelmingly an organ of one party or the other. Governmental and political interference or control must be kept at an absolute minimum. Along these same lines, the committee amended the section of title II pertaining to programming to provide for strict balance between opposing viewpoints on controversial matters." 113 Cong.Rec. 26380 (1967). The House version of the Act, H.R. 6736, contained the objectivity and balance provisions. They were incorporated in conference into the final bill. H.R.Rep.No.794 (Conf.Rep.), 90th Cong., 1st Sess. 13 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1834, 1835.

ance in overseeing adherence to § 396(g)(1)(A). As Judge Robinson pointed out, the House Committee Report referring to the role of "interested citizens" "anticipated that citizen participation through the political process would assist Congress in its oversight function." 183 U.S.App.D.C. at 82, 561 F.2d at 975.

In these cases we stressed the careful framework designed by Congress to balance public accountability with maximum freedom from governmental interferences. Congressional oversight was the means to maintain that balance. While the exact manner in which Congress would review CPB's performance had not been specified, it was understood that such scrutiny would occur through the annual reporting and appropriations processes.

## II. TAPING REQUIREMENTS TO AID CONGRESS IN THE ASSURANCE OF "STRICT OBJECTIVITY AND BALANCE"

Section 399(b) was enacted in 1973 as a little-noted part of Public Law 93–84.[34] The prominent feature of that law was its authorization of a two-year financing appropriation for CPB, and most of the legislative history focuses on that financing provision. The Senate and House reports simply described the taping requirement, with no statement of its rationale.[35] To discern Congress's purpose in enacting § 399(b), all counsel have looked to a single colloquy during the Senate hearings and a single statement from the House floor.

During these 1973 Senate hearings, Senator Robert Griffin, the sponsor of § 399(b) and *amicus* in this case,[36] discussed the taping requirement with the then president of the Public Broadcasting Service, Hartford Gunn. They agreed it would assist apprais-

als of the "strict objectivity and balance" provision.

Senator Griffin: During this committee's consideration of the 1970 Public Broadcasting authorization bill, I offered an amendment which was quickly opposed by many people in Public Television—an amendment which would have provided that audio tapes of public affairs programs would be available at the expense of the person requesting a copy.

There is the provision in the 1967 act which states that one of the purposes of the act is to facilitate the development of high-quality programs "with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature."

You certainly agree with that part of the act, I would think?

Mr. Gunn: Yes.

Mr. Griffin: And you don't want Government censorship of your programs?

Mr. Gunn: No, sir.

Senator Griffin: But it would seem to me that private individuals who are interested in trying to assess the objectivity of those programs should have some way of finding out what was on the air.

Mr. Gunn: I agree, yes, sir.

Senator Griffin said that his interest in the issue arose out of a concern that the requisite balance had been lacking in a nationally distributed program concerning the Anti-ballistic Missile System, a controversial issue decided in the Senate by one vote. He continued:

Senator Griffin: I had heard about this program and that it was biased and unbalanced. Unfortunately, I did not get to see it, but, of course, you can't be watch-

---

**34.** Act of August 6, 1973, Pub.L. No. 93–84, § 2, 87 Stat. 219.

**35.** S.Rep.No.93–123, 93d Cong., 1st Sess. 14–15 (1973); H.R.Rep.No.93–324, 93d Cong., 1st Sess. 3, 16 (1973).

**36.** Senator Griffin advocated a taping requirement for years before its enactment in 1973. In 1970 the Senate adopted Griffin's amend-

ment as part of pending public broadcasting finance legislation, but the taping requirement was deleted in conference after it was disclosed that the amendment had not been the subject of hearings in either house. H.R.Rep.No.1466 (Conf.Rep.), 91st Cong., 2d Sess. 3 (1970), *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 3963, 3964.

ing all the channels all the time. At the time, I asked for a transcript or a tape and indicated that I would be glad to pay for whatever expense was involved, but the answer was no, even though I was a Member of Congress, and even though I was a member of this committee.

Mr. Gunn: Was that request made of the Public Broadcasting Service or was it made of the producer of the program? I am trying to recall.

Senator Griffin: I can't recall either. In any event, I did not get any help. Frankly, your letter to the Wall Street Journal only keeps me going, because you are going to make these tapes available only to people that you consider have proper credentials in research or journalism.

Now, if you believe that policy is a substitute for my legislation, I don't. To avoid any kind of Government censorship, you should make programs broadcast over-the-air available to the public as is the case with material that is printed in the newspaper. It is in the public domain at that point. I don't see how any broadcaster can refuse or make it difficult to find out what has been put on the air.

Mr. Gunn: I agree with you absolutely.

*Public Broadcasting—Hearings on S. 1090 Before the Subcommittee on Communications of the Senate Committee on Commerce,* 93d Cong., 1st Sess. 113–114 (1973).

Petitioners contend that this dialogue reveals an intent of censorship. The exchange does not support that view. There was no suggestion of advance clearance. Senator Griffin's remarks arose in the context of a statutory mandate that CPB fund programs that meet the "strict objectivity and balance" requirement. That mandate,

as already noted, must be met by every program (or series, if the program is part of a series) as contrasted with the fairness doctrine's loose standard pertaining to the general programming of a licensee.

Senator Griffin was interested in a means of providing information about program content to permit assessment of the required objectivity and balance. His further reference to the taping requirement as a means of avoiding governmental censorship was not explicated. It is reasonably read as indicating a belief that general access to tapes would obviate the need for Congress to institute any kind of formal monitoring in order to oversee compliance with the strict objectivity and balance standard of § 396(g)(1)(A).[37]

The thrust of Senator Griffin's position during the 1973 hearings was essentially identical to, and is illuminated by, his position the previous year. Appearing before the House Subcommittee on Communications, Senator Griffin stated that adoption of a taping requirement would "ensure greater objectivity and balance." He continued:

At present, there is no procedure whereby broadcasts of public interest can be monitored to insure that both the spirit and the letter of the law are carried out.

It is inconceivable to me how these provisions of the Public Broadcasting Act can ever have any meaning when the public is denied the right to examine what is broadcast over government regulated air waves by broadcasters who are subsidized with public funds.

\* \* \* \* \* \*

Of course, I am aware of the fact that the Corporation for Public Broadcasting

---

**37.** By its terms § 399(b) requires the recording "of any program in which any issue of public importance is discussed." Section 396(g)(1)(A) requires "strict adherence to objectivity and balance in . . . programs of a controversial nature." The scope of § 399(b) is conceptually broader than that of § 396(g)(1)(A), although it is difficult to visualize a CPB-funded program in fact, as contrasted with theory, that is not "controversial" notwithstanding the discussion of an issue of "public importance."

Assuming arguendo that there might be such an instance, it is reasonable for Congress to write a record-keeping requirement modestly broader than the substantive standard, in order to assure that all programs which are "of a controversial nature" are recorded. The "issue of public importance" provision in § 399(b) is a practical delineation of the class of programs likely to present an issue as to the applicability of § 396(g)(1)(A).

has recently reiterated its intent to be objective and fair in public affairs programming. I am also aware that the Corporation can require a station to provide copies of all programs to the Corporation which are underwritten by grants from the latter.

But this procedure needs to be expanded so that all the public can have a reasonable opportunity to review controversial programs.

*Hearings on Financing for Public Broadcasting Before the Subcommittee on Communications and Power of the House Comm. on State and Foreign Commerce,* 92d Cong., 2d Sess. 241–243 (1972).

We turn to the only other fragment of legislative history attending the passage of § 399(b). On the House floor Congressman Van Deerlin stated:

The 2-year authorization period serves notice that we intend to protect an institution of free expression that is the property of the American people, and not the instrument of a partisan unit of government. This does not mean that the legislative branch must surrender all its responsibilities. The oversight and appropriations processes will continue to assure that legislative responsibility is being met.

In addition, section 2 of the proposed legislation stipulates that any station receiving assistance from CPB make audio transcriptions of programs in which any issue of public importance is discussed. These tapes must be maintained by the station for 60 days, for possible public scrutiny. Of course, no commercial broadcaster is saddled with this require-

ment—it comes dangerously close to censorship. For this reason, I must point out that as far as I am concerned the provision in question is in no way a "hunting license" for the Federal government. Rather, it is a housekeeping device, which I anticipate will be rarely if ever used.

119 Cong.Rec. 25175 (1973).

Plainly, Mr. Van Deerlin found the rationale for the taping requirement in Congress's responsibility for the appropriations and oversight processes. In the absence of that responsibility as to commercial broadcasters, who do not produce or broadcast programs funded under the Act, Mr. Van Deerlin thought that application of the taping requirement to commercial broadcasters might be deemed a threat to editorial freedom. Whatever the merits of that observation, Mr. Van Deerlin's statement cannot be read as suggesting that a taping requirement is censorial when Congress has oversight responsibility and concern that the funded programs comply with the special standard of strict objectivity and balance.

When relevant legislative history appears in oral rather than written exposition, as it does here, some imprecision in the formulation of Congress's objective is hardly extraordinary. However, the history fairly reveals one purpose for § 399(b)—to facilitate monitoring by the public and Congress of compliance with the strict objectivity and balance requirement of § 396(g)(1)(A). That purpose is entirely consistent with Congress's legitimate interest in ensuring that the expenditure of federal funds is consistent with statutory mandates, an interest emphasized in the Senate and House reports.[38] Congressmen may look to the

---

**38.** S.Rep.No.117, 93d Cong., 1st Sess. 7 (1973):

As long as Federal funds are being given to public broadcasting, your Committee strongly believes Congress not only has the right but the obligation to assure itself that they are being expended as it intends. The Committee's own oversight responsibility, and the necessity of an annual appropriation assures this. There should, therefore, be no misgivings that a two-year authorization would permit the Corporation to ignore or otherwise disregard its statutory mandates.

Similarly, the House report stated:

Your Committee believes that as long as federal funds are given to public broadcasting, Congress has the obligation to ensure their proper expenditure. This obligation can be fully satisfied by resort to our oversight powers and responsibilities as well as through the appropriations process. Congress has ample authority to ensure that CPB satisfies its statutory mandate without the necessity of a crippling annual authorization.

H.R.Rep.No.324, 93d Cong., 1st Sess. 9–10 (1973).

assistance of citizens in discharge of the oversight function. See *Network Project v. CPB,* 183 U.S.App.D.C. 70, 82, 561 F.2d 963, 975 (1977).

### III. LIMITED SCOPE OF THE STATUTE, AND ITS CONSTITUTIONALITY

With this background, we consider petitioners' intertwined equal protection and First Amendment challenges to § 399(b).

This is not a regulation that can be said to "abridge" speech because it is aimed at suppressing ideas or information, which would raise a presumption of unconstitutionality.[39] Although the taping regulation is not limited to mere "time, place and circumstance," it does not preclude expression of ideas; while it may be pesky, it is a minimal burden. It calls First Amendment considerations into play as a matter of analysis rather than by reason of substantial impact. It is much ado about little for a public licensee to complain that keeping an audio tape of what is aired to the public at large is a substantial restraint on freedom of communication. We live in a world where lively and tendentious journals, magazines and books are routinely deposited in the Copyright Office, subject to public access, without a whisper of deprivation of First Amendment freedoms. In fact, in declining to impose this minimal record-keeping requirement on all licensees, the FCC relied, in part, on the public's failure to examine those programs that had been taped under § 399(b).[40]

This is the intermediate case of a claim that there is a government rule of such a nature that compliance with it might discourage the communication of ideas or information. This kind of claim is typically encountered when a statute regulates conduct, whether by prohibition or requirement, but may have an adverse impact on expressive freedom. The analysis applicable for such intermediate cases is to give the rule or statute the type of scrutiny that is appropriate whenever the First Amendment is brought "into play," but to sustain incidental limitations on First Amendment freedoms so long as there is a "substantial" governmental interest, and so long as any incidental restriction on First Amendment freedoms is no greater than is needed to serve that interest.[41]

No further constitutional difficulty is presented, even given First Amendment overtones, by basing the challenge on equal protection grounds[42] and by attacking the validity of either or both of the two statutory classifications—the first, that commercial broadcasters are not subject to the Act (Public Broadcasting Act); the second, that the taping requirement applies only to programs involving issues of public importance.

As to both sets of constitutional contentions, the validity of the statute is grounded in the statutorily expressed governmental interest in maintaining "strict adherence to objectivity and balance" in those programs that are funded by the government and are of a controversial nature. In our view, that is a substantial interest, and the limits on content that are inherent in a requirement of objectivity and balance are not violative of First Amendment freedoms. This point, which will be developed further, establishes the validity of § 396(g)(1)(A).

**39.** L. Tribe, American Constitutional Law 580–85 (1978). "[O]rdinarily, at least, government has no power to restrict expression because of its message, its ideas, its subject-matter, or its content." *Id.* at 581 (quoting *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)).

**40.** *See Petition For Rulemaking To Require Broadcast Licensees To Maintain Certain Program Records, Third Report and Order,* 64 F.C. C.2d 1100, 1110–14 (1977). The fact that the public is not looking at the program tapes does

not mean that Congress exceeded its powers in providing for public access to them.

**41.** *See United State v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); L. Tribe, *supra* note 38, at 580–84.

**42.** We recognize that there are instances of cases with First Amendment overtones where successful constitutional challenges are put on equal protection grounds. *E. g., Police Department of Chicago v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

As to the audio taping requirement of § 399(b), it imposes an insubstantial burden; it serves the governmental interest of assuring a record that will be available to verify compliance with the objectivity and balance requirements; and no less intrusive means of achieving that objective is available. The classifications in § 399(b), properly construed in light of the purpose of that section, are narrow and directly related to the substantial governmental interest in § 396(g)(1)(A).

We begin our analysis by confronting the fact that the literal terms of § 399(b) do not limit the taping requirement to programs that are subject to the standards of § 396(g)(1)(A), i. e., programs funded by CPB. The statute appears to apply indiscriminately to any program in which an issue of public importance is discussed that is broadcast by a noncommercial station that has received any aid under the Public Broadcasting Act after August 6, 1973.

If the statute were applied literally, it would mean, for example, that any commercial licensee who received assistance after August 6, 1973, in the form of a grant for facilities approved by the Secretary of Health, Education and Welfare [43] would be bound forever to the audio taping requirement, even though no subsequent Federal assistance was sought or received. This was not the understanding of Mr. Van Deerlin, the only Congressman who spoke to § 399(b) on the floor, and who referred to it as a requirement imposed on stations

"receiving assistance from CPB." As for Senator Griffin, he was concerned that the arrangement whereby CPB obtains tapes of programs that it underwrites "be expanded so that all the public can have a reasonable opportunity to review controversial programs." [44] Neither expression of purpose suggests that the taping requirement was intended to do any more than aid in congressional enforcement of the "strict objectivity and balance" requirement imposed on CPB-funded programs.

A literal application of the statute would also mean that a private college radio station that received a grant to broadcast a series of local concerts would thereafter be indefinitely obliged to tape all of its public affairs programming. Such an application of § 399(b) would work a drastic alteration of the whole thrust of the Public Broadcasting Act. That Act was designed to preclude interference with local stations while assuring adequate control of the mechanism, CPB, through which federal funds would be channeled into public broadcasting. The Act was not to "impair or affect the existing statutory duty and responsibility of the station licensee." [45] Noncommercial stations were to remain subject to established regulation, including the fairness doctrine.[46] But stations were to be strengthened, not burdened, by the Act. Apart from a provision not pertinent to this case concerning station editorializing,[47] the Act avoided any restrictions on licensee freedom.

43. 47 U.S.C. § 392 (Supp. V 1975).

44. *See* pp. —— — —— of 192 U.S.App.D.C., pp. 1142–1143 of 593 F.2d *supra* (statements of Rep. Van Deerlin and Sen. Griffin).

45. 113 Cong.Rec. 26384 (1967) (Statement of Congressman Staggers, chairman of the House committee which considered the Public Broadcasting Act and floor manager for the Act).

46. *See Accuracy in Media, Inc. v. F.C.C.,* 172 U.S.App.D.C. 188, 195, 521 F.2d 288, 295 (1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).

47. Section 399(a) provides: "No noncommercial educational broadcasting station may engage in editorializing or may support or oppose

any candidate for political office." 47 U.S.C. § 399(a) (Supp. V 1975). Some have found this provision constitutionally suspect. *See, e. g.,* Emery, *Is There A Constitutional Flaw in the Public Broadcasting Act of 1967?,* 2 Educ. Broadcasting Rev. 17 (1968). The context of this case does not require us to consider § 399(a) or the possible constitutional problems it raises. Although commercial licensees may editorialize, *Editorializing by Broadcast Licensees,* 13 F.C.C. 1246 (1949), the editorialization restriction placed on noncommercial licensees was not advanced as a justification for the imposition of a taping requirement solely on the latter class of broadcasters.

We think it inconceivable that Congress would have intended such a radical change in its approach to public broadcasting without any reference in the legislative history.[48] It would be particularly difficult to reconcile such a change with the emphatically voiced concern for the protection and enhancement of licensee vitality and independence found in the legislative history of Public Law 93–84.[49]

The legislative history of § 399(b) reveals Congress's purpose for imposing the taping requirement on programs funded by CPB: furtherance of the substantial governmental interest in oversight of the use of federal funds. Congress gave no clue as to what, if any, substantial interest would be advanced by also imposing a taping requirement on programs that are produced without federal funds. In the absence of any guidance from Congress, we are unable to discern such an interest.[50] Nor may we rely on judicial imagination to answer the question before us. Courts engaged in the careful scrutiny of legislation, as we must be, are not free to conjecture an important governmental interest when one has not surfaced in congressional deliberations.[51] Sound constitutional principles demand that Congress carefully consider the justification for a statute touching on First Amendment interests.

A court is not obligated to invalidate § 399(b) *in toto* simply because some of its literal applications are constitutionally problematic or infirm. We call attention to several principles, no one of which is fully applicable to this case, but which taken together fairly point our path. These include the doctrine that a court may depart from the literal meaning of a statute on

---

**48.** The Supreme Court expressed itself similarly in an analogous situation where a statutory interpretation, plausible in light of the statute's express terms, entailed a radical departure from prior Congressional policy, a departure that was not discussed anywhere in the statute's legislative history. *Tidewater Oil Co. v. United States,* 409 U.S. 151, 157–58, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972).

**49.** S.Rep.No.123, 93d Cong., 1st Sess. 8–11, 13 (1973); H.R.Rep.No.324, 93d Cong., 1st Sess. 3, 7, 9 (1973). *See, e. g.,* 119 Cong.Rec. 14522, 14526, 14599, 25700 (1973).

**50.** In response to the inquiry of a panel of this court as to the important interests furthered by § 399(b), the FCC referred to a possible interest in "a temporary archive [which] could prove useful to individuals simply desiring to obtain copies to preserve significant programs that stations may have broadcast in carrying out their obligations as public trustees." FCC, Response to Remand (Adopted May 24, 1977) at 14. The FCC does not argue that this interest is substantial. Furthermore, the FCC does not explain why Congress would not have had such an interest with regard to significant programs of commercial licensees, who have, along with fairness considerations, the same duty as noncommercial licensees to present programs on important contemporary issues. FCC, *The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act (Fairness Report),* 48 F.C.C.2d 1 (1974). The FCC considered a requirement that commercial licensees make available a transcript or tape recording of all their news and public affairs programs, but concluded that benefits to the public would not outweigh the costs. FCC, *Petition For Rulemaking To Require Broadcast Licensees To Maintain Certain Program Records, Third Report and Order,* 64 F.C.C.2d 1100 (1977).

**51.** In cases, like this, invoking an intermediate level of scrutiny, the Supreme Court has disallowed after-the-fact rationalizations for legislative action that were advanced by counsel. In *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975), the Court stated that "mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." Following *Wiesenfeld,* the Court in *Califano v. Goldfarb,* 430 U.S. 199, 214–17, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), looked to the legislative history of the challenged statute to determine for itself what the "actual purpose" of the statutory discrimination had been. Finding that Congress gave no attention to the objectives advanced by appellants, the Court refused to accept those objectives as justifications for the challenged statute. We read these cases to support our conclusion that it would be inconsistent with careful scrutiny to hypothesize the very interests we are then obliged to scrutinize. *See* L. Tribe, *supra* note 38, at 1085–87. Tribe also suggests that "[i]n first amendment cases, the Supreme Court is least likely to take into account governmental interests which, though conceivable, are not actually advanced by counsel, or were not actually considered by the relevant decision-maker." *Id.* at 602.

discerning that it does not "mean what it says,"[52] the rule that literal meaning does not control when it leads to unreasonable results for which there is no expression of legislative intent;[53] the more general concept that in statutory interpretation and application legislative history may ·override the plain meaning of text;[54] the approach of avoiding statutory interpretations raising constitutional problems;[55] the principle of severability, retaining part of a statute although another part is invalid;[56] and the principle permitting a narrowed construc-

tion which excises the breadth inimical to First Amendment interests so long as there is an ascertainable line that delineates permissible applications.[57]

In our view, the proper scope of § 399(b) consists of application to programs subject to the provisions of 396(g)(1)(A). This conclusion sustains Congress's substantial interest in overseeing compliance with the statutory mandates applicable when federal funds are used for program production. The limiting construction excises the consti-

---

**52.** *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

**53.** *See, e. g., Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); C. Sands, Sutherland Statutes and Statutory Construction § 54.06 (4th ed. 1973).

**54.** *See, e. g., United States v. American Trucking Assns.*, 310 U.S. 534, 542–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); C. Sands, Sutherland Statutes and Statutory Construction § 48 (4th ed. 1973).

**55.** *See, e. g., Lynch v. Overholser*, 369 U.S. 705, 710–711, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962); ("a statute should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts"); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *United States v. Delaware & Hudson Co.*, 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909); *United States v. Thompson*, 147 U.S.App.D.C. 1, 5, 452 F.2d 1333, 1337 (1971), *cert. denied*, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972); *Doe v. Martin*, 404 F.Supp. 753, 762 (D.D.C.1975). *Cf. Simpson v. United States*, 435 U.S. 6, 13, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978).

**56.** The guiding doctrine appears in *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932):

Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

Precisely that doctrine and language were relied on in *Buckley v. Valeo*—both by this court, *see Buckley v. Valeo*, 171 U.S.App.D.C. 172, 229, 519 F.2d 821, 878 (1975), and by the Supreme Court, 424 U.S. 1, 108–09, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (aff'g in part and rev'g in part). The limitation to CPB-funded programs leaves § 399(b) both operative and in furtherance of the oversight of compliance with

the strict objectivity and balance standard that was the core justification for the taping requirement.

Opinions of this court illustrate the judicial role in limiting statutes to avoid constitutional difficulties. In *United States v. Thompson*, 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), *cert. denied*, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972) this court, in an opinion by Judge Wright, acknowledged that it was departing from the statutory term—" 'any criminal offense committed in the District of Columbia' "—if "read literally." 147 U.S.App.D.C. at 10, 452 F.2d at 1342. In limiting the scope of the strict bail provisions of the D.C. Court Reform and Criminal Procedure Act of 1970 to violations of statutes having local application, on the ground that this furthered the legislative objective, Judge Wright applied the doctrine that courts avoid an interpretation that "would create a substantial doubt" as to constitutionality. *See* 147 U.S.App.D.C. at 5, 9, 452 F.2d at 1337, 1341. *See also Founding Church of Scientology v. United States*, 133 U.S.App.D.C. 229, 409 F.2d 1146, *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969), which held that although the Food, Drug and Cosmetics Act proscribed any mislabeled device, the court would not apply the Act to Scientology's "E-meter," and literature. Judge Wright observed, 133 U.S.App.D.C. at 242, 255, 409 F.2d at 1159: "Were the literature here introduced clearly secular, we might well conclude that under existing law it constituted 'labeling' for purposes of the Act. . . . However, such broad readings are not favored when they impinge upon constitutionally sensitive areas, especially in the absence of a showing of legislative intent to regulate these areas."

**57.** *See, e. g., Arnett v. Kennedy*, 416 U.S. 134, 158–63, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Time, Inc. v. Hill*, 385 U.S. 374, 380–391, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Dombrowski v. Pfister*, 380 U.S. 479, 491, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); L. Tribe, *supra* note 38, at 714–16; Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844 (1970).

tutionally suspect application of the taping requirement to nonfederally funded programs, an application for which there is no expression of congressional purpose and which is inconsistent with those congressional concerns that have been expressed.[58]

Section 399(b), thus limited, does not violate petitioners' constitutional rights. It directly and narrowly furthers the governmental interest in effective oversight of the expenditure of federal funds. It is not invidious to distinguish between those who broadcast programs made available by CPB and those who do not. There is a plain nexus between means and ends, and it passes scrutiny. The standards of strict objectivity and balance are more stringent than the fairness doctrine, and apply to each program or series of programs, rather than to the station's coverage as a whole.[59] Congress could reasonably decide on an audio recording to help in a fair determination of such difficult questions as a program's "objectivity," and we cannot fault this approach to fulfillment of a congressional function.

Furthermore, the burden imposed on stations to comply with § 399(b) will be negligible, if not *de minimis*. CPB already requires stations to send it tapes of locally produced programs it has underwritten.[60] Under the provisions of § 399(b)(2), stations can designate CPB as the entity to make recordings available to the public.[61] Simi-

larly, with regard to programs procured by CPB for regional and national distribution, CPB can be designated as the entity which will make and supply the tapes in response to public inquiries.

Since our opinion supports the constitutionality of § 399(b) because of the government's interest in the strict objectivity mandate of § 396(g)(1)(A), the constitutionality of that section must be addressed.

Federal support of expression does not of itself violate the First Amendment.[62] In *Buckley v. Valeo*, 424 U.S. 1, 92–93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court pointed out that the provision protecting free speech contains no establishment clause; the Constitution forbids abridgment or censorship of speech, not its enhancement. The Court noted that legislation to support First Amendment values "is the rule, not the exception. Our statute books are replete with laws providing fundamental assistance to the exercise of free speech, such as aid to public broadcasting and other forms of educational media, 47 U.S.C. §§ 390–399 . . . ." *Id.* at 93 n.127, 96 S.Ct. at 670.

The content standards of § 396(g)(1)(A) are requirements of objectivity and balance. These standards were enacted to minimize the possibility of a governmental or politically partisan perspective in federally funded programs. Congress has a substantial interest in avoiding the use of government

---

**58.** Therefore, the relation of § 399(b) to ongoing CPB funding for programs cannot rightly be described as "little more than coincidental." Judge Wright opinion at p. —— of 192 U.S.App. D.C., at p. 1120 of 593 F.2d. The very purpose ot § 399(b) is rooted in the maintenance of the strict objectivity and balance standard, as appears from the statements of its sponsor, Senator Griffin. The legislative history makes clear that the taping requirement was directed toward assuring compliance with the strict objectivity and balance requirement in programs funded by CPB.

**59.** *See* note 29 *supra*.

**60.** S.Rep.No.869, 91st Cong., 2d Sess. 8 (1970), *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 3954, 3960.

**61.** 47 U.S.C. § 399(b)(2) (Supp. V 1975): "The requirements of paragraph (1) shall not apply with respect to a licensee's broadcast of a program if an entity designated by the licensee retains an audio recording of each of the licensee's broadcasts of such a program for the period prescribed by paragraph (1)." *See FCC, Report and Order*, 57 F.C.C.2d 19, 23 (1975) (analysis by the FCC of the function and purposes of the designated entity).

**62.** *See* T. Emerson, The System of Freedom of Expression 627–633, 645–653 (1970). Emerson acknowledges the need for affirmative governmental action to promote the functioning of the system of freedom of expression, although "government supported expression can never be an acceptable substitute for independently financed expression." *Id.* at 653.

funds to endorse a "political" message.[63] "The real danger in the injection of government money into the marketplace of ideas is that the market will be distorted by the promotion of certain messages but not others." *Advocates for Arts v. Thomson*, 532 F.2d 792, 798 (1st Cir. 1976). The requirement of a "neutral" message bears no such threat to First Amendment concerns.

We conclude that the government is constitutionally permitted to finance program production, although this, and concomitant authority to set neutral standards, brings some amount of governmental authority into the realm of program content.[64] We are not confronted in this case with the First Amendment considerations that might be implicated were the government to possess a programming monopoly or a captive audience.[65] Stations may reject programs that are federally funded.[66]

Congress has made an effort to support public affairs programming while ensuring that federal funds are not spent on propaganda directed at U.S. citizens. This is not constitutionally impermissible. Federally funded producers are not required to forego the exercise of rights they would otherwise enjoy. They remain free to express themselves as they choose in programs developed without public funds.

\*  \*  \*  \*  \*  \*

Judge Robinson's concurring opinion contends that the taping requirement does not "reasonably [relate] to any objective to which the Government permissibly can aspire," concurring opinion at —— of 192 U.S.App.D.C., at 1135 of 593 F.2d, and in support develops commentary suggesting that the existence of government financing does not justify even a neutral requirement, and that legitimate fears of government propagandizing might support restrictions on the government, but not on the broadcaster.

This fails to grapple with the effort of Congress to minimize the possibility of a governmental or politically partisan perspective in federally funded programs and in avoiding the use of governmental funds to endorse a "political" message. Philosophers may cherish the nicety of a contention that even-handed balance is a kind of tilted propaganda. But it borders on the quixotic to assert that it is not reasonable to take a different approach. Indeed the opposite approach is implicit in the fairness doctrine and in the approach taken by the Supreme Court in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). And indeed in the adversary system. It is as simple as the belief that presenting both sides of controversial items is likely to lead to truth. To say that balance on controversial programs is not even a reasonable objective or corollary of government funding takes one's breath away.

Judge Robinson says that all Congress needed to do was to take action against *government* influence and propaganda. But Congress was setting up an institution with considerable independence, and was concerned that it would develop an elitist partisanship, fostered from within its own institution. A markedly independent CPB might develop its own policies. On the other hand, even an independent CPB might develop a subtle political steering with an eye on appropriations—and mandatory balance is a reasonable way of coping with that problem.

While Congress has reserved the function of examining the performance of public television during its appropriation and oversight reviews, there are safeguards. The

---

**63.** *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

**64.** T. Emerson, *supra* note 60, at 652.

**65.** The applicability of First Amendment values to the broadcasting media is well established. *See, e. g., Columbia Broadcasting System v.* *Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

**66.** S.Rep.No.222, 90th Cong., 1st Sess. 7 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin. News, pp. 1772, 1778.

appropriations function is a blunt instrument—and can only be exercised in terms of total dollar appropriations. This inhibits its use by particular Congressmen for "getting at" particular programs. Similarly the bipartisan nature of Congress forestalls any efforts at political domination or coercion of public television. Also, as cases in this court have established, there is no judicial or agency enforcement of the standards of § 396(g)(1)(A).

In contrast, Judge Wright's opinion raises the question whether there is any means, that he would consider constitutionally acceptable, for Congress to implement a system of congressional oversight of public broadcasting. To deny this to Congress might prove more doom than boon to public broadcasting. We cannot assume that Congress would provide funds without any further meaningful role, if that emerges as a judicial requirement.

We are not insensitive to the tension between federal funding and public broadcasting's freedom of expression. There have been suggestions of reforms in order to enhance the independence of public broadcasters.[67] Examining the existing relationship between federal funding and public broadcasting, we do not see a violation of the First Amendment. In our view, the government has authority to set standards of objectivity and neutrality for the programs it funds through CPB, and § 399(b), providing a taping requirement for those programs, is a non-intrusive and non-discriminatory means to monitor compliance with those standards.

The theoretical risk of a "chill" bids us be wary, but not to the point of hypochondriasis. The possibility that this tape-recording requirement will actually chill expression by licensees verges on the minuscule—although the matter must rest in the domain of judgment and cannot be proved in the abstract as a matter of logic. For the theoretical risk there is a comparable and adequate response. Even a requirement that is upheld in the first instance as limited and related to a valid purpose, may prove in the light of experience to be an encroachment; then, and in that event, it must be declared invalid. This is the approach of *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 392–94, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). For the present, we cannot say that the statute is facially invalid.

MacKINNON, Circuit Judge, dissenting:

I join in Parts I and II of Judge Leventhal's dissenting opinion, and I agree with the result in Part III so far as it goes. However, I do not join in Judge Leventhal's limiting construction of the scope of section 399(b), which construction in my view, improperly narrows the plain meaning of the words of that statute. Because I do not believe that Judge Leventhal's limitation of the scope of the statute is necessary to uphold it, I would affirm the statute and the rule promulgated thereto *in toto*, with the caveat that the protective jurisdiction of the courts is always available if the oversight function of the statute, as applied, is used to deny constitutional rights.

As stated by Judge Leventhal, Congress, under the Public Broadcasting Act of 1967,[1] appropriates funds for the production of programs to be broadcast by noncommercial television and radio stations.[2] The Act also authorizes appropriations for varied types of assistance to such stations, including matching grants for construction,[3] grants for telecommunicative demonstrations and projects,[4] and funds for the various undertakings of the Corporation for Public Broadcasting, an independent, nonprofit

---

67. *See*, Chase, *Public Broadcasting and the Problem of Government Influence: Towards a Legislative Solution*, 9 U. of Mich.J. of L.Reform 64 (1975); Canby, *The First Amendment and the State as Editor: Implications for Public Broadcasting*, 52 Texas L.Rev. 1123 (1974).

1. Act of Nov. 7, 1967, Pub.L. No. 90–129, 81 Stat. 368, *as amended*, 47 U.S.C. §§ 390–99.

2. 47 U.S.C. §§ 396(g), (k).

3. 47 U.S.C. §§ 391, 392.

4. 47 U.S.C. § 392a, Pub.L. No. 94–309, 90 Stat. 685 (1976).

corporation established by the Act to assist in developing a noncommercial educational broadcasting system.[5] Educational broadcasting, supported in whole or in part by federal assistance given under the Act via the Corporation, is required to meet the standard of "strict adherence to objectivity and balance in all programs or series of programs of a controversial nature."[6] As Judge Leventhal observes:

> That standard is more rigorous than that applicable to licensees generally under the fairness doctrine, which provides a loose standard of general balance in a licensee's overall programming and has no requirement for individual programs.

Leventhal, J., dissenting op. at ⸺ of 192 U.S.App.D.C., at 1136 of 593 F.2d. The justification for this different treatment is perfectly obvious and adequate—one licensee operates in part on government funds and the other does not. If this is not adequate justification, then a great many requirements imposed by statutes on recipients of appropriated funds or participants in Government programs will necessarily be negated.[7] I would hold that it is adequate justification. Congress, with special cognizance of the important role to be performed by the public in assisting it in the discharge of its function, reserved for itself the oversight responsibility of assuming that programs produced with federal funds or broadcast by stations relying upon federal assistance for their operation conform to the strict objectivity and balance standard.[8] The right to impose the standard has never been questioned. In my view this is a legitimate and substantial government interest.[9] Thus, I agree with the result reached by Judge Leventhal with respect to federally funded programs. However, I would also reach this same result and apply the plain language of that statute to all programs broadcast by any licensee "which receive[d] assistance under sections 390 to 399 [of the Public Broadcasting Act] . . . in

---

5. These activities include establishing and developing one or more systems of interconnection to be used for the distribution of educational television or radio programs; establishing and developing one or more systems of noncommercial television or radio broadcast stations; aiding in the financing of the costs of television or radio programming and operation of the stations; establishing and maintaining a library and archives of programs and related materials; and publicizing noncommercial broadcasting. 47 U.S.C. § 396(g).

6. 47 U.S.C. § 396(g)(1)(A).

7. See Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958) ("[B]eyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges"); King v. Smith, 392 U.S. 309, 333 n.34, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968) ("There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed . . . ."); see also Silva v. Romney, 473 F.2d 287, 290 (1st Cir. 1973).

8. Compare Leventhal, J., dissenting op. at ⸺ ⸺ of 192 U.S.App.D.C., at 1136 of 593 F.2d, which concludes that Congress reserved for itself the oversight responsibility for federally funded programs only, and that this is a legitimate and substantial government interest.

9. Stations that receive public funds under the Act are not similarly situated with stations that do not receive such funds. The statute's purpose is to make broadcast stations that receive support from public funds more responsive to members of the public by making their public affairs programming more accessible through the recording requirement and the concomitant establishment of a limited temporary archive. And Congress in § 399(b)(5) authorized grants "to any licensee of a noncommercial educational broadcast station who received assistance under this part [§§ 390–99] of the *full amount* necessary to acquire equipment to permit such licensee to comply with paragraph (1) of this subsection [sixty day retention of audio recordings]." (Emphasis added.) Because the regulated media generally receive substantial benefits from government regulation of the airwaves, it follows that broadcast stations which do not receive public funds are also, in some respects, the public's business. Yet it is not unreasonable for Congress to conclude that the public has a greater interest in stations that utilize public funds for part or all of their operation and are held out to the public as pure "noncommercial educational broadcast stations." Thus, I agree with Judge Leventhal that limiting the reach of section 399(b) to publicly funded stations is both legitimate and substantially related to a valid governmental interest.

which any issue of public importance is discussed." 47 U.S.C. § 399(b)(1).

The history of section 399(b), which Judge Leventhal has incisively probed,[10] demonstrates that the purpose of the provision is to facilitate monitoring by the public and by Congress of compliance, by licensees who broadcast programs discussing issues of public importance with the assistance of federal funds, with the strict objectivity and balance requirement of section 396(g)(1)(A).[11] That purpose is entirely consistent with Congress' interest in ensuring that federal funds are expended consistently with statutory mandates (Leventhal, J., dissenting op. at —— of 192 U.S.App. D.C., at 1146 of 593 F.2d). And it is clear that *Congress contemplated the assistance of citizens in the discharge of the oversight function.* As stated in the House Committee Report,

> The educational stations must not be permitted to become vehicles for the promotion of one or another political cause, party, or candidate. It is assumed that the normal checks and balances within our political system will insure that this principle *will be constantly safeguarded by interested citizens.*

H.R.Rep. No. 572, 90th Cong., 1st Sess. (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1799, 1810 (emphasis added).

The Act's legislative history demonstrates that Congress did not intend to involve the federal government in the programming decisions of local stations.[12] It did not seek to authorize any prior restraint. Yet Congress was genuinely concerned that additional public affairs broadcasting was needed and that the use of public funds to that end carried with it the obligation to insure "strict adherence to objectivity and balance in all programs" (47 U.S.C. § 396(g)(1)(A)). Thus, by authorizing the "full amount" for recording requirement, Congress sought to help insure objectivity and to enlist the public's involvement in furtherance of that objective.

The statute provides for access to such programming through the recording requirement by "any . . . person" (47 U.S.C. § 399(b)(3)(B)). To encourage compliance and public involvement therein, Congress established a *limited* archive of public affairs programs which would be available to everyone on an equal basis.[13]

---

**10.** Leventhal, J., dissenting op. at — – — of 192 U.S.App.D.C., at 1141–1146 of 593 F.2d.

**11.** Chief Judge Wright has concluded that section 399(b) was intended "to impose the threat of congressional or governmental control over the content of noncommercial public affairs broadcasting." Wright, C. J., op. at —— of 192 U.S.App.D.C., at 1114 of 593 F.2d. Judge Leventhal has analyzed the legislative history, and I agree with his interpretation of it. Leventhal, J., dissenting op. at — – — — of 192 U.S.App. D.C., at 1141–1146 of 593 F.2d. Judge Leventhal's position, in my view, is bolstered by the Court's holding in *United States v. O'Brien*, 391 U.S. 367, 383–89, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968):

> When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator

> to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

> It is thus impermissible for the courts in a situation such as we have here to impose a prior restraint on the application of the statute. What is needed is a concrete case involving the application of the statute.

**12.** Leventhal, J., dissenting op. at — – — of 192 U.S.App.D.C., at 1137–1139 of 593 F.2d; H.R.Rep. No. 572, 90th Cong., 1st Sess., at 15, 17–18 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1799, at 1805, 1807–08; S.Rep. No. 222, 90th Cong., 1st Sess. at 4, 7 (1967), *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 1772, at 1775, 1778; 47 U.S.C. §§ 396(g)(1)(D), 398.

**13.** Section 399(b) merely preserves material already available in full to the public for the simple effort of listening and/or watching a station or channel for a limited period. The statute merely preserves, as would a newspaper archive, the material published by the broadcast stations. Unlike the newspaper archive, the material is preserved only for a limited period of time.

This would provide the public with access to programs which they had reason to believe, either correctly or incorrectly, did not satisfy the statutory requirement of "strict adherence to objectivity and balance." [14] In pursuit of that end, an authoritative record of what was said is an absolute necessity to fair adjudication of complaints. It is hard to understand that people would object thereto. If it deters the broadcast of irresponsible, inaccurate, and slanted utterances in contravention of the objectivity and balance requirement of section 396(g)(1)(A) with the assistance of public funds, so much the better. That is a valid public purpose which is applicable to all "noncommercial educational broadcasting station[s]" (47 U.S.C. § 399(a)), and it matters not that the federal assistance is furnished to the construction of the station or to its programs.

Chief Judge Wright has concluded that a substantial government interest does *not* exist in recording programs of public importance that are produced with federal funds and Judge Leventhal reaches the same conclusion except where the *programs* are funded by the Government. It is recognized that these noncommercial stations broadcasting educational programs receive funds from both private and governmental sources, and that some programs are produced with private funds. Also, it is true that some government funds are used for purposes other than the production of programs, such as construction or acquisition of equipment, *etc.* When federal funds are used to construct or operate a facility, in whole or in part, and that facility holds itself out to the public as acting in the public interest and not for commercial purposes (that is, functioning for impartial public motives), that use enables funds from private sources to be released and directed toward program production. The public's interest in preventing the expenditure of government funds to thus assist indirectly in the production of programs that are not objective and balanced is just

as great as the public's interest in preventing the direct expenditure of government funds *to transmit* a slanted and unbalanced program in whole or in part. Hence, I do not agree that section 399(b) should be given a narrow construction that does violence to its plain language. The policy decision was properly made by Congress, the decision to so condition the receipt of public funds is validly within the power of Congress over appropriations, and therefore there is no basis for us to depart from the plain words of the Act. Where station personnel are used in public affairs broadcasts and federally assisted programs, it would be a difficult if not impossible task to determine the extent of the assistance derived from federal funds, and the statute does not require that the Commission undertake the task of tracing such moneys.

Even though I would uphold the statute as written, I would also recognize that the power conferred by this statute, like that in many others, is capable in its application of being improperly applied by those charged with its administration. For instance, if the oversight function were used to impose an impermissible prior restraint, the courts would be open to prevent it, as in all similar cases. Other types of abuse could well demand a finding that the particular application of the statute was invalid. Such conduct would also violate the clear prohibition of the statute:

> Nothing contained in sections 390–399 . . . shall be deemed . . . (2) to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television broadcasting, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or personnel of any educational institution, school system, or educational broadcasting station or system.

**14.** Maintaining a limited archive would also benefit stations by providing a convenient conclusive response to critics who charged that

some subject had been treated unfairly or inaccurately by the station.

47 U.S.C. § 398. Thus any federal "agency, officer, or employee" who attempted "to exercise any direction, supervision, or control over educational . . . broadcasting, or over . . . any . . . grantees" would be in clear violation of the statute.

Awaiting the actual operation of the statute as recommended by Judge Leventhal, dissenting op. at —— of 192 U.S.App.D.C., at 1150 of 593 F.2d, and followed in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 392–94, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), has particular cogency in this case where the injury that petitioners claim they have suffered is largely abstract and speculative. My statement in *Tatum v. Laird*, 144 U.S. App.D.C. 72, 444 F.2d 947 (D.C. Cir. 1971), *rev'd*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), has relevance to the damage here claimed:

> There is nothing more here than a highly abstract claim based on an imaginary fear that governmental power to collect information for a valid purpose will be misused for an improper *purpose*. Similar fears might exist with respect to any government power. All power is susceptible of misuse, but that truism when coupled with unfounded fear alone is not sufficient to make out a case for judicial jurisdiction.

144 U.S.App.D.C. at 86, 444 F.2d at 961 (MacKinnon, J., dissenting), *rev'd*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). As stated by the Supreme Court in *Tatum v. Laird, supra,*

> Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; "the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

408 U.S. at 13–14, 92 S.Ct. at 2325–26.

The mere potential impairment of a constitutional right under a statute does not by itself create a justiciable controversy. *Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 71, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *International Longshoremen's Union v. Boyd*, 347 U.S. 222, 224, 74 S.Ct. 447, 98 L.Ed. 650 (1954). In the event it ever happens that more specific allegations of interference with First Amendment rights are articulated, "there will be time enough to reconsider the constitutional implications." *Red Lion Broadcasting v. FCC, supra*, 395 U.S. at 393, 89 S.Ct. at 1808.

For the foregoing reasons, I conclude that the statute is valid in its entirety, should be given its plain reading, and I would not issue an advisory opinion based essentially on a prophecy that beneficiaries of government largess necessarily need fear pressures that would violate the statute and the Constitution. *See Red Lion Broadcasting v. FCC, supra*, 395 U.S. at 392–95, 89 S.Ct. 1794; *Preiser v. Newkirk*, 422 U.S. 395, 401–02, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 218–23, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Younger v. Harris*, 401 U.S. 37, 41–42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Boyle v. Landry*, 401 U.S. 77, 80–81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). In so doing the majority clearly exceed any jurisdiction conferred on the federal courts. I respectfully dissent, and Judge Robb joins herein.